**GERITREX CORPORATION, Plaintiff,**

v.

**DERMARITE INDUSTRIES, LLC,
Norman Braunstein and John
Zimmerman, Defendants.**

**No. 95 Civ. 9424 (WCC).**

United States District Court,
S.D. New York.

Jan. 10, 1996.

Handal & Morofsky, Norwalk, Connecticut (Anthony H. Handal, of counsel), for plaintiff.

Ostrolenk, Faber, Gerb & Soffen, LLP, New York City (Max Moskowitz, Charles P. LaPolla, Marc A. Lieberstein, of counsel), for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Geritrex Corporation ("Geritrex") is a manufacturer of skin-care, personal hygiene and cleaning products marketed primarily to hospitals, nursing homes and other health care providers. Defendant DermaRite Industries, L.L.C. ("DermaRite") manufacturers competing products. Defendants Norman Braunstein and John Zimmerman are former employees of Geritrex and current employees of DermaRite.

Geritrex filed this action on November 3, 1995. Geritrex alleges, essentially, that DermaRite, Braunstein and Zimmerman copied its product formulations, packaging and promotional information in order to produce a competing product line cheaply and quickly. Geritrex also alleges that DermaRite and Braunstein used its customer list and price information to lure away Geritrex customers. Geritrex has asserted causes of action for misappropriation of trade secrets, breach of noncompetition and confidentiality agreements allegedly signed by Braunstein and Zimmerman, unfair competition and trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), copyright infringement, dilution of the distinctive quality of its products under N.Y.Gen.Busi.Law § 368–d, and deceptive business practices under N.Y.Gen.Busi.Law § 173.

Shortly after filing suit, Geritrex applied for a temporary restraining order and a preliminary injunction. At a telephone conference with counsel held on November 7, 1995, we orally denied plaintiff's application for temporary restraints because we did not have enough information to assess plaintiff's likelihood of success on the merits of its claims. We scheduled a preliminary injunction hearing for November 22, 1995, and instructed the parties to brief the issues before the hearing. Defendants cross-moved to dismiss plaintiff's cause of action for copyright infringement.[1] On November 22 and November 24, we held an evidentiary hearing at which we heard the testimony of several witnesses, including Braunstein, Zimmerman and Anthony Madaio, the president of Geritrex. Following the hearing, we permitted the parties to submit additional memoranda of law. We base this decision on the complaint, the memoranda and affidavits filed in this action and the testimony and documentary evidence presented at the preliminary injunction hearing. For the reasons set forth below, plaintiff's motion for a preliminary injunction is denied, and defendants' motion to dismiss is granted.

### BACKGROUND

Geritrex was founded approximately eighteen years ago by Madaio (Tr. 23).[2] Its manufacturing and sales operations are based at one site in Mount Vernon, New York. Geritrex currently has approximately 250 customers (Tr. 43). Total sales for 1994 were $2.2 million (Tr. 86), and Madaio projected that sales for 1995 would total $1.8 million (Tr. 87).

---

1. Defendants' notice of motion states that their motion to dismiss is directed to Count I of the complaint, which is plaintiff's cause of action for misappropriation of trade secrets. *See* Complaint, at 4. It is apparent from defendants' memorandum of law, however, that defendants' motion actually addresses plaintiff's claim for copyright infringement. *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, at 9.

2. "Tr. __" indicates references to the transcript of the preliminary injunction hearing.

In April 1994, defendant Braunstein began working at Geritrex as its Vice–President of Sales (Tr. 200, 266). He left Geritrex in late March 1995 (Tr. 200, 266). It is undisputed that while he was employed by Geritrex, he had access to its customer list and information concerning which customers purchased which products or received discounted prices (Tr. 202). Braunstein currently owns a minority equity position in DermaRite, serves as its president and runs its sales operations (Tr. 200–01, 296).

In August 1994, John Zimmerman joined Geritrex, where he served as production manager (Tr. 337). He left Geritrex in late May 1995 (Tr. 337). While Zimmerman was employed by Geritrex, he was involved in all facets of production and had access to product formulations and to information about prices and suppliers of ingredients and packaging (Tr. 65–66, 337–38). Zimmerman began working for DermaRite in early June 1995 (Tr. 230). In addition to setting up DermaRite's manufacturing facility, his duties include formulating products, managing production and obtaining ingredients and packaging (Tr. 219, 230–36).

DermaRite was formed in May 1995 by Braunstein and Israel Minzer, a businessman with contacts in the nursing home industry (Tr. 292–96). Zimmerman testified that he completed the development of at least one DermaRite product by the end of August 1995 and finished work on the remainder of the twenty products in DermaRite's product line by the end of September 1995 (Tr. 232). According to Braunstein, DermaRite currently has about 35 customers, 12 of which were formerly Geritrex customers (Tr. 203). Total sales as of the date of the preliminary injunction hearing were approximately $100,000 (Tr. 203–04, 312). Braunstein offered testimony, as yet uncontroverted, that approximately $30,000 in sales is attributable to former Geritrex customers (Tr. 202, 303).

## DISCUSSION

I. Plaintiff's Motion for Preliminary Injunction

■ Plaintiff requests a preliminary injunction prohibiting defendants from competing with plaintiff for six months on the ground that Zimmerman and Braunstein signed confidentiality and noncompetition agreements during their employment with Geritrex. Plaintiff also asks us preliminarily to enjoin defendants from continuing to use its product formulations, manufacturing processes, supplier information, customer list and price information on the ground that defendants have misappropriated plaintiff's trade secrets. Finally, plaintiff seeks a preliminary injunction prohibiting defendants from using DermaRite's current packaging or any other packaging that infringes Geritrex's trade dress. To prevail on its motion for a preliminary injunction, plaintiff "must demonstrate both (1) irreparable harm in the absence of the requested relief, and (2) either (a) a likelihood that it will succeed on the merits of the action, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992).

A. Merits and Balance of Hardships

1. Breach of Contract

■ Plaintiff has requested a preliminary injunction prohibiting defendants from competing with plaintiff for six months. Plaintiff contends that Zimmerman and Braunstein have breached confidentiality and noncompetition agreements that they signed during their employment with Geritrex. Under New York law, such agreements are disfavored but will be enforced by the courts where the restrictions are reasonably limited geographically and temporarily and the enforcement is necessary, *inter alia,* to protect trade secrets or confidential customer lists. *See Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.,* 871 F.Supp. 709, 728 (S.D.N.Y.1995); *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.,* 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 5 (1977); *Briskin v. All Seasons Servs., Inc.,* 206 A.D.2d 906, 615 N.Y.S.2d 166, 167 (1994).

Plaintiff has submitted to the court copies of agreements signed by other Geritrex employees, *see* Exhibit W, and blank copies of the versions of the agreement that Zimmer-

man and Braunstein allegedly signed. *See* Exhibits C, D. The agreement provides, in pertinent part, that the Geritrex employee agrees to hold confidential all information concerning product formulation, marketing, packaging, and customers. It also provides that for six months after the termination of employment with Geritrex, the employee may not directly compete with Geritrex or acquire an interest in a business in direct competition with Geritrex. Assuming that the agreement is enforceable, if either Zimmerman or Braunstein signed it, he appears to have violated, at the least, the noncompetition provisions. Both Zimmerman and Braunstein admit that they began to work for DermaRite within six months of leaving Geritrex, and Braunstein acquired a minority interest in DermaRite. Plaintiff has not produced agreements signed by Zimmerman or Braunstein, however, and both men maintain that they never signed any such agreement.

■ With respect to Zimmerman, the evidence currently before us indicates that he did not sign the agreement. Zimmerman has emphatically denied even being asked to sign (Tr. 344). By contrast, Madaio testified that shortly after Zimmerman began working at Geritrex, he gave Zimmerman a blank agreement and asked him to sign it. Madaio admits that Zimmerman never returned a signed agreement to him personally, but asserts that he assumed that Zimmerman had done as he requested (Tr. 64–65). The evidence indicates, however, that Madaio did not begin asking Geritrex employees involved in production to sign agreements until September 1995.[3] *See* Exhibit W; Affidavit of David Ralphs, dated November 14, 1995, at ¶ 5, attached as Exhibit 3 to Defendants' Post–Hearing Memorandum; Tr. 65, 104, 119, 123, 245, 279–86, 349. Therefore, we find that plaintiff has not demonstrated a likelihood of success, or even a serious question for litigation, on the merits of its breach of contract claim against Zimmerman because it has not adduced any convincing evidence that Zimmerman signed an agreement.

■ With regard to defendant Braunstein, however, this issue is not so easily resolved. Braunstein also contends that he never signed an agreement. He admits that Madaio asked him to sign one shortly after he joined Geritrex, but he asserts that, on the advice of his lawyer, he refused. He claims that Madaio nevertheless permitted him to continue to work for Geritrex. He maintains that he did not hear any more about an agreement until he was asked to sign one on the day that he quit (Tr. 273–74, 287–89). He introduced into evidence, as support for his version of the facts, the affidavit of his attorney and an unsigned copy of the agreement that he states was found in his attorney's files. *See* Exhibit 1; Declaration of Salvatore Diliberto, dated Nov. 29, 1995, at ¶¶ 2, 4, attached as Exhibit 5 to Defendants' Post–Hearing Memorandum.

Madaio testified, on the other hand, that Braunstein signed an agreement when he began working for Geritrex and that Madaio saw the signed agreement himself. In April 1995, Madaio's attorney asked him for all of the salespeople's signed agreements as part of the discovery conducted in an administrative proceeding regarding another former employee's unemployment compensation. At that time, Madaio allegedly discovered that Braunstein's agreement was missing. Plaintiff has submitted a copy of a facsimile from Madaio to his attorney and his attorney's affidavit in support of this aspect of Madaio's testimony. *See* Exhibits A, B; Exhibit T, at ¶¶ 5, 7 (Affidavit of Anthony J. Maiocchi, dated Nov. 21, 1995). Madaio theorizes that Braunstein had removed the agreement from his file. According to Madaio, he asked

---

**3.** Plaintiff has produced only one agreement signed by a production employee prior to September 1995. Defendants have, by comparing the wording and layout of the various form agreements used by plaintiff in 1994 and 1995, cast substantial doubt on whether that agreement was signed on September 21, 1994, as indicated on the agreement (Tr. 279–86). The agreement in question is identical in format and wording to a revised agreement signed and dated in November 1995, rather than to an earlier version of the agreement signed by another production employee in September 1995. *Compare* Vallejo Letter, Pannella Letter and Lebedeva Letter, included in Exhibit W. Defendants contend, and at this point we are inclined to agree, that it is likely that the agreement purportedly signed in September 1994 was actually signed in November 1995 and backdated.

Braunstein to sign another agreement, but Braunstein refused and quit on the spot (Tr. 49–54, 63).

The evidence indicates that Madaio did make an effort to ensure that all of the members of his sales force signed agreements. Plaintiff has submitted copies of a number of agreements signed by other sales employees during 1994. *See* Exhibit W. Furthermore, Braunstein admits to having testified at the abovementioned unemployment proceeding that all members of the sales force were required to sign agreements (Tr. 206). Based on the evidence currently before us, there appears to be a close factual question concerning whether Braunstein signed an agreement. We cannot say that plaintiff is likely to succeed on the merits of this issue, but plaintiff has demonstrated that a sufficiently serious question for litigation exists.

### 2. Misappropriation of Trade Secrets

Plaintiff next asserts that it is entitled to a preliminary injunction on the ground that DermaRite, Zimmerman and Braunstein misappropriated information proprietary to Geritrex in order to develop and market DermaRite's products. To establish misappropriation of a trade secret, plaintiff must prove that: "(1) it possessed a trade secret, and (2) [defendants are] using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990). "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* Plaintiff has identified two types of information that it alleges constitute trade secrets. The first is the product for-mulas, manufacturing processes, ingredient suppliers and packaging suppliers that it uses in the manufacture of its products. The second is its customer list and price information.

Although New York courts have identified a number of factors that courts may look to in determining whether information constitutes a trade secret, *see id.,* the most important consideration is whether the information was kept secret. *See Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 298 (2d Cir.1986). Plaintiff must show that it took substantial measures to protect the secret nature of its information. *See Julie Research Laboratories, Inc. v. Select Photographic Engineering, Inc.,* 810 F.Supp. 513, 520 (S.D.N.Y.1992), *aff'd in pertinent part,* 998 F.2d 65, 67 (2d Cir.1993).

With respect to the information about plaintiff's manufacturing processes and product formulas, it is clear from the evidence before us that plaintiff did not take substantial measures to keep that information secret.[4] Plaintiff has not produced convincing evidence that any of the employees involved in production—from the operations director and the plant manager down to the batch makers who actually mixed the products—signed confidentiality agreements prior to September 1995. The original product formulations were kept in a filing cabinet in Madaio's office that may, or may not, have been marked confidential and that may, or may not, have been locked (Tr. 38–39, 101, 110–11, 347–48). Be that as it may, that information also appeared on the batch records that were printed out for each batch made of a product (Tr. 112). Those batch records contained a list of the ingredients used to make a product and an exact, step-by-step description of the manufacturing process (Tr. 38, 112). Of the three copies of each batch record, one or two copies were destroyed when the batch was completed and

---

4. Defendants contend, moreover, that the product formulations can be easily acquired by others. Information that is readily ascertainable from publicly available sources does not constitute a trade secret. *See Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 604 N.Y.S.2d 912, 918, 624 N.E.2d 1007, 1013 (1993). Defendants argue that any chemist experienced in mixing simi-lar formulations could reproduce plaintiff's formulations from reading the ingredients on the product labels and consulting publicly available formulation guides. Plaintiff hotly disputes the feasibility of duplicating its products in this way. We need not comment on this issue at this time, however.

the remaining copy or copies were filed as part of Geritrex's permanent records. *Compare* Tr. 341–42 (Zimmerman; two copies destroyed and one filed) *with* Affidavit of Michael Bernstein, dated Dec. 8, 1995, at ¶ 5 (vice versa). There is conflicting testimony regarding what happened to the copies that were destroyed: Zimmerman asserts that they were frequently thrown into the waste-paper basket unaltered while Madaio and Bernstein state that they were ripped up before being discarded. *See* Tr. 36, 100, 342; Bernstein Aff., at ¶ 5. Whatever happened to the destroyed copies, it is clear that the filed copies were accessible, as cartons of batch records (some unsealed) were stored in several unlocked areas of the Geritrex facility. *See* Tr. 355; Bernstein Aff., at ¶ 7, ("Most of these cartons are sealed."). Furthermore, nothing prevented an employee from copying a batch record while he or she was working with it. The batch records were not stamped confidential (Tr. 121). Zimmerman's uncontroverted testimony established that he regularly and quite openly took work, including batch records, home (Tr. 346–47). Michael Bernstein, the operations director, frequently worked on batch records in the cafeteria where any employee or visitor to the Geritrex plant could have had access to the records. *See* Tr. 114–17, 342–43; Bernstein Aff., at ¶ 8. This evidence persuades us that plaintiff did not make substantial efforts to limit access to this information to employees who needed to know the product formulations.

Plaintiff contends that the Geritrex facility has only two doors, both locked, and that access to the building is limited to employees and escorted visitors (Tr. 395–96). While this fact is indicative of some attempts at secrecy, *see Integrated*, 920 F.2d at 174, it is not determinative in view of the overwhelming indications that plaintiff did not take substantial measures within the plant to protect the confidentiality of the product information from visitors or from employees who had no need to know it. Indeed, Madaio has admitted that he relied on the professional ethics of his production employees to keep Geritrex's product information secret (Tr. 56–59), which simply does not constitute substantial efforts at secrecy.

■ We may make short shrift of plaintiff's argument that the source of the packaging for its products constitutes a trade secret. Anyone may easily determine the manufacturer of the containers for plaintiff's products by picking up the package and reading the manufacturer's name. Information that is readily ascertainable in this fashion does not constitute a trade secret. *See Ashland*, 604 N.Y.S.2d at 918, 624 N.E.2d at 1013. Furthermore, plaintiff has presented no credible evidence at this time from which we could determine whether it has made substantial efforts to keep secret the sources of the ingredients used in its products.

Because Geritrex failed to take substantial measures to keep this alleged proprietary information secret, plaintiff has not demonstrated a likelihood of success on the merits, or even the existence of a serious question for litigation, on the issue of whether information regarding its product formulations, manufacturing processes, ingredient sources or packaging constitutes a trade secret.

■ Turning to plaintiff's contentions with respect to its customer list and price information, plaintiff's argument is somewhat stronger but ultimately unsuccessful. Although there is no evidence before us at this time that this information was marked confidential or that access to it was limited to sales personnel, the members of the sales force had, for the most part, signed confidentiality and noncompetition agreements. Braunstein, whether he signed the agreement or not, admits that Madaio presented it to him. Braunstein was therefore aware that plaintiff sought to keep its customer list and price information confidential (Tr. 206). Hence, there is at least some indication that plaintiff made efforts to keep its customer list and price information secret, and plaintiff may well succeed in establishing that this information constitutes a trade secret.

Even if we assume that Geritrex's customer list and price information are trade secrets, however, plaintiff has not presented convincing evidence that demonstrates that DermaRite has been using that information to compete for Geritrex customers. As head of sales for Geritrex, Braunstein undoubtedly

had access to its customer list and price information. He has also acknowledged that while he worked for Geritrex, he added some business cards to the file of business contacts that he has developed over the course of his twenty-year career (Tr. 301, 318). Braunstein does not deny being aware of Geritrex's relationships with "a handful" of the customers that he has contacted (Tr. 319), but he maintains that he has gathered his information about potential customers from a number of sources, including publicly available directories of nursing homes and hospitals and Minzer's apparently extensive contacts in the nursing home business (Tr. 292, 300–02). Indeed, Braunstein has testified that only 12 of DermaRite's 35 customers are former Geritrex customers. Braunstein has also offered uncontroverted testimony that DermaRite's two largest customers, responsible for approximately $60,000 in sales, were never Geritrex customers. Based on this evidence, we cannot find, at this juncture, that plaintiff is likely to succeed in demonstrating that defendants have used Geritrex's customer list and price information to lure away its customers. Plaintiff has, however, demonstrated that a serious question for litigation exists on this issue.

### 3. Trade Dress Infringement

▬▬ Finally, Geritrex argues that it is entitled to a preliminary injunction because DermaRite's trade dress creates an impression in the consumer that Geritrex is the source of DermaRite's products. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides protection for the "trade dress" of a product. Trade dress "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985). To prevail on its trade dress claim, plaintiff must demonstrate (1) that its products' appearance is inherently distinctive or has acquired secondary meaning—*i.e.*, the consuming public identifies the products with Geritrex—and (2) that pur-

chasers are likely to confuse DermaRite's goods with Geritrex's. *See Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1068, 1070 (2d Cir.1995).

▬▬ We need look no farther than the second factor to resolve plaintiff's request for a preliminary injunction. The Second Circuit has set forth a non-exclusive list of the factors that courts should consider in evaluating the likelihood of consumer confusion. They are:

> the strength of [Geritrex's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that [Geritrex] will bridge the gap [between the two products], actual confusion, [DermaRite's lack of] good faith in adopting its own mark, the quality of [DermaRite's] product, and the sophistication of the buyers.

*See Bristol–Myers*, 973 F.2d at 1043. No single factor is determinative. *See Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir.1995).

▬▬ Considering these factors in order, the strength of plaintiff's trade dress is questionable, apart from the presence of plaintiff's trade name or one of its trademarks on the packages. There is no evidence that any other visual characteristics of the packages are recognized as identifying the source of the goods.

With respect to the factor of similarity, we note that the relevant inquiry is not how many points of similarity exist between the two sets of packaging, "but rather whether the two trade dresses 'create the same general overall impression.'"[5] *Bristol–Myers*, 973 F.2d at 1046. It is apparent from even a cursory inspection of color photographs of Geritrex and DermaRite's products that the overall appearance of the trade dress of the two product lines is not similar. *See* Exhibits K1–K17; L1–L17. The labels on the front of DermaRite's products are of uniform design. They consist of the product name printed from bottom to top on the left side of

---

**5.** Hence, the evidence presented by Geritrex that DermaRite copied some product information from the labels of Geritrex's products does not suffice to show trade dress infringement. Even

if DermaRite intentionally copied certain aspects of Geritrex's labels, there is no trade dress infringement unless the overall appearance of the packaging is likely to cause consumer confusion.

the label. The name appears in medium blue and grey lettering on a background of alternating medium and light blue stripes. The DermaRite logo appears in medium blue on a black rectangle located at the top of the label and set at a right angle to the product name. The remainder of the label contains product information printed in black and medium blue lettering.

By comparison, Geritrex's product labels are not entirely uniform. Most of the labels are printed in only two colors: dark blue and white. A stylized "G" printed inside a hexagon appears in the top left corner of the label. This logo is usually printed inside a dark blue triangle. The product name is printed on the diagonal below the triangle and the Geritrex name and address often appear at the bottom of the label below the product information. In sum, the appearance of the two companies' labels is very different. Furthermore, the sources of the products are clearly identified on the packaging, which militates against a finding of similarity. *See id.*, at 1045–46.

Plaintiff makes much of the fact that its product Geri–Protect and DermaRite's competing product Peri–Guard are packaged in plastic bottles of the same size that rest on their caps. Indeed, we note that many of Geritrex and DermaRite's competing products appear to be sold in packages of similar size and shape. Nevertheless, given the very different labels on the packages and the limited number of feasible container sizes and shapes for packaging skin care products and cleansers, we do not believe that any similarities in package size and shape would be apt to create a likelihood of consumer confusion.

The next two factors favor plaintiff. Geritrex and DermaRite's products are in close proximity in the marketplace. Indeed, there is no gap between these directly competing products to bridge.

Plaintiff has not, however, adduced any convincing evidence of actual confusion. The only testimony directed to the issue of actual confusion was Madaio's account of receiving, after Braunstein left Geritrex, one inquiry addressed to Braunstein requesting a price quotation for a product that Geritrex had previously discontinued. According to Madaio, the wording of the letter indicated that Braunstein had communicated with the inquirer after he left Geritrex and that the inquirer nevertheless believed that Geritrex made the product in question (Tr. 95–99). Because Madaio was unable to produce the letter at the hearing, however, we do not find this testimony convincing.

Plaintiff has also not produced any evidence that DermaRite adopted its trade dress in bad faith. Furthermore, even if we assume that DermaRite deliberately copied plaintiff's product formulations, that fact has no bearing on the question of whether DermaRite copied the outward appearance of Geritrex's packaging in a manner likely to confuse consumers. Indeed, the overall lack of similarity between DermaRite and Geritrex's trade dress tends to indicate that DermaRite did not deliberately imitate Geritrex's trade dress in an attempt to capitalize on Geritrex's reputation with consumers.

Plaintiff has testified that the two companies' products appear to be of the same quality (Tr. 48). This circumstance could perhaps increase the potential for consumer confusion, although that confusion would not be based on the outward appearance of the product packages.

Finally, the sophistication of the buyers with which DermaRite and Geritrex do business weighs heavily against plaintiff. Their consumers are typically the purchasing agents for hospitals, nursing homes, and other health care providers. These individuals are experienced consumers who consider purchases carefully and are unlikely to confuse Geritrex's product with DermaRite's. This conclusion is borne out by testimony from both Braunstein and Madaio regarding the difficulties encountered by salespeople in acquiring new customers (Tr. 43–44, 301–02).

On balance, we see no likelihood of confusion between Geritrex and DermaRite's products. Accordingly, we find that plaintiff has not demonstrated a likelihood of success on the merits, or even a serious question for litigation, on this issue.

### 4. Balance of Hardships

■ Although plaintiff has failed to demonstrate a likelihood of success on the merits

of any of the claims on which it bases its application for a preliminary injunction, it has established that serious questions for litigation exist with respect to its claim that Braunstein breached a confidentiality and noncompetition agreement and its claim that DermaRite is using its alleged trade secret customer list and price information to lure away Geritrex's customers. Hence, we must balance the hardships that each party faces in order to determine whether a preliminary injunction is appropriate.

Geritrex has offered evidence that its sales have declined roughly 20%, from approximately $2.2 million during 1994 to a projected $1.8 million for 1995. Geritrex has as yet offered no convincing evidence that this decline was a result of DermaRite's activities. Madaio testified that he first noticed a drop-off in sales in August 1995 (Tr. 87–88), but he did not produce monthly sales records to support this contention. Nevertheless, it is difficult to imagine that DermaRite's presence in the market could cause a $400,000 drop in Geritrex's sales, particularly where purchases by former Geritrex customers represent only about $30,000 of DermaRite's sales. Furthermore, the parties do not dispute that the regional marketplace is highly competitive. Indeed, Braunstein offered testimony, as yet uncontroverted by plaintiff, that only 1% of the nursing homes in New York, New Jersey and Connecticut are Geritrex customers (Tr. 307). In such a competitive market, it is by no means clear that plaintiff's losses are attributable to DermaRite, which has only a tiny market share (roughly .14%).

By contrast, the effect of a preliminary injunction on DermaRite would be devastating. It is a fledgling company, with only 35 customers and $100,000 in total sales as of the date of the hearing. Braunstein is a minority owner of DermaRite, its president and head of its sales force. A preliminary injunction prohibiting him from competing with Geritrex might well put DermaRite out of business. Furthermore, Geritrex seeks to enjoin DermaRite's entire product line, which would have an obviously catastrophic effect on DermaRite. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995). The balance of hardships, therefore, weighs sharply in defendants' favor.

Plaintiff contends that defendants cannot be heard to complain about potential damage to their business because Braunstein and Minzer invested in DermaRite despite knowing that Braunstein had signed a confidentiality and noncompetition agreement. This argument is, of course, based on the hotly disputed premise that Braunstein signed an agreement. We will not issue a preliminary injunction on such a dubious basis. Plaintiff also argues that we should disregard the potential for hardship to DermaRite because, at the least, Minzer and Braunstein knew before investing that Geritrex considered its customer list and price information confidential. Plaintiff bases this contention on Braunstein's admission that he told Minzer that Madaio had presented him with a confidentiality and noncompetition agreement (Tr. 317–18). While there may be some merit to this argument, it is not sufficient to tip the balance of hardships decidedly in plaintiff's favor.

### B. Irreparable Harm

Although our analysis of the merits of the case and the balance of hardships provides a sufficient basis for denying plaintiff's motion, we note that plaintiff has also failed to demonstrate irreparable harm. We are well aware that in a trade dress infringement case, a finding of likelihood of consumer confusion establishes the risk of irreparable harm, *see Jeffrey Milstein,* 58 F.3d at 31, because of the damage to plaintiff's business reputation that may be presumed to stem from the confusion of its products with another's. We have determined, however, that there is, as yet, no convincing evidence of a likelihood of confusion in this case. Hence, plaintiff may not benefit from the application of this presumption.

We are also well aware that the Second Circuit has held that the damage caused by loss of trade secrets is ordinarily not measurable in terms of money damages. *See FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir.1984) (per curiam) ("A trade secret once lost is, of course, lost forever."); *Computer Assocs. Int'l, Inc. v.*

*Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992). In this case, however, plaintiff does not contend that there is any danger of defendants disseminating its alleged trade secrets; instead, plaintiff contends only that it will suffer injury from defendants' use of the alleged trade secrets to lure customers away from Geritrex. It seems to us that under these circumstances, the only possible injury that plaintiff may suffer is loss of sales to a competing product. *See* 4 Rudolf Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 22.37, at 279 (1995) (citing *Bayline Partners L.P. v. Weyerhaeuser Co.,* 31 U.S.P.Q.2d 1051, 1055, 1994 WL 286337 (N.D.Cal.1994)). In the event that plaintiff proves its case at trial and secures a permanent injunction against DermaRite's use of Geritrex's alleged trade secrets, any harm done to plaintiff in the interim should be ascertainable by comparing the customer lists and sales information of the two companies and should be fully compensable by money damages unless defendants are judgment-proof.

In the absence of a presumption in its favor, plaintiff has not demonstrated that it is likely to suffer irreparable harm if DermaRite is permitted to continue its operations until this matter is ready for trial. Plaintiff has alleged only that its sales are projected to be 20% lower this year than last year, and it has provided no evidence of a direct link between defendants' activities and plaintiff's decreased sales.

As plaintiff has failed to satisfy both prongs of the standard for granting a preliminary injunction, we deny plaintiff's motion.

## II. Defendants' Motion to Dismiss

 Defendants have moved to dismiss plaintiff's claim for copyright infringement of plaintiff's product catalog. Defendant contends, correctly, that registration of the copyright is a prerequisite to plaintiff's infringement claim. *See* 17 U.S.C. § 411(a); *Whimsicality, Inc. v. Rubie's Costume Co.,* 891 F.2d 452, 453 (2d Cir.1989); *Carter v. Helmsley–Spear, Inc.,* 861 F.Supp. 303, 331 (S.D.N.Y.1994), *aff'd in pertinent part,* 71 F.3d 77, 79–80 (2d Cir.1995). The complaint does not allege that plaintiff has registered a copyright on its product catalog. *See* Complaint, at ¶ 50 ("Plaintiff is the owner of Copyright Registration No. ____ [left blank] for said product catalog."). Therefore, this court is without jurisdiction to decide plaintiff's claim for copyright infringement, and that claim is dismissed.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied. Defendants' motion to dismiss plaintiff's claim for copyright infringement is granted.

SO ORDERED.