

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-3-2000

# BP Chem Ltd v. Formosa Chem & Fibre Corp.

Precedential or Non-Precedential:

Docket 99-5452

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"BP Chem Ltd v. Formosa Chem & Fibre Corp." (2000). *2000 Decisions.* Paper 212.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/212

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 3, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-5468/5469 and 99-5423/5451/5452

BP CHEMICALS LTD. (an English corporation)

v.

FORMOSA CHEMICAL & FIBRE CORPORATION
(a Taiwanese corporation); JOSEPH OAT CORPORATION
(a Pennsylvania corporation)

  Formosa Chemical & Fibre Corporation
  Appellant in Nos. 98-5468 and 99-5423

  Joseph Oat Corporation
  Appellant in Nos. 98-5469 and 99-5451

BP CHEMICALS LTD. (an English corporation)
  Appellant in No. 99-5452

v.

FORMOSA CHEMICAL & FIBRE CORPORATION
(a Taiwanese corporation); JOSEPH OAT CORPORATION
(a Pennsylvania corporation)

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 97-cv-04554)
District Judge: Honorable Joseph J. Rodriguez

Argued February 29, 2000

Before: ALITO and STAPLETON, Circuit Judges, and
POLLAK,* District Judge

_____

* Honorable Louis H. Pollak, Senior United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

(Filed: October 3, 2000)

John E. Caruso
Montgomery, McCracken, Walker &
 Rhoads
123 South Broad Street
Philadelphia, PA 19109
 and
Daniel L. Brockett (Argued)
Robin G. Weaver
Squire, Sanders & Dempsey
4900 Society Center
Cleveland, OH 44114-1304
 Attorneys for Appellee/
Cross-Appellant BP Chemicals Ltd.

Marc S. Palay (Argued)
Winston & Strawn
43 Rue du Rhone
1204 Geneva
Switzerland
 and
Jerome W. Pope
Winston & Strawn
35 West Wacker Drive, Suite 4200
Chicago, IL 60601
 and
Jonathan F. Bloom
Robert D. Carmignani
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA 19103
 Attorneys for Appellant/
Cross Appellee Formosa Chemical
& Fibre Corporation

Allison E. Accurso
Jon C. Martin
Fox, Rothschild, O'Brien &
 Frankel, LLP
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648-2311
 Attorneys for Appellant/
Cross-Appellee Joseph Oat
Corporation

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This is a trade secret case filed in the United States District Court for the District of New Jersey by BP Chemicals Ltd. (BP), a British corporation, against Formosa Chemical & Fibre Corporation (FCFC), a Taiwanese corporation, and Joseph Oat Corporation (JOC), a Pennsylvania corporation with its principal place of business in New Jersey. BP asserts claims underS 44(b) and (h) of the Lanham Act, 15 U.S.C. S 1126(b) and (h), Articles 2 and 10 bis of the Paris Convention for the Protection of Industrial Property (hereinafter "the Paris Convention"), and New Jersey common law. BP alleges that FCFC misappropriated trade secrets relating to its methanol carbonylation process for making acetic acid by copying elements of an acetic acid plant design that BP's predecessor, Monsanto, had provided in 1980 to a licensee, China Petrochemical Development Corporation (CPDC). BP further alleges that FCFC and JOC entered into a contract whereby JOC would fabricate in New Jersey a number of chemical process vessels and heat exchangers using misappropriated technical specifications for ultimate use in the construction of an acetic acid plant in Taiwan. BP sought a preliminary injunction preventing JOC and FCFC from exporting these vessels to Taiwan. BP's amended complaint made clear that it sought to enjoin FCFC not only from taking possession of the JOC equipment, but from taking possession of any equipment manufactured in

3

the United States by U.S. companies using BP's trade secrets. BP also sought compensatory and punitive damages from FCFC.

FCFC moved to dismiss the claim against it for lack of personal jurisdiction. The District Court deferred ruling on the motion until the conclusion of the five-month preliminary injunction hearing. The Court ultimately denied FCFC's motion to dismiss and ruled that BP had demonstrated its entitlement to preliminary injunctive relief against FCFC and JOC. The injunction entered pertained only to the JOC equipment. Following further submissions of the parties, the District Court established the length and terms of the injunction, limiting the duration to thirty months, beginning April 20, 1998, and ending October 20, 2000. FCFC and JOC filed timely notices of appeal. BP filed a timely cross-appeal.

The undisputed facts are as follows. FCFC is a publicly-traded Taiwanese corporation with its principal place of business in Taipei, Taiwan. FCFC is a subsidiary of a Taiwanese conglomerate known as the Formosa Plastics Group (FPG), which is owned by Y.C. Wang. In 1996, FPG's U.S. operations produced revenue of $2.58 billion. FCFC has a 3.51% stock interest in Formosa Plastics Corporations (FPC), a Delaware corporation with headquarters in New Jersey. In developing the design for its acetic acid plant, FCFC used "ASPEN" software that it leased from Nan Ya Plastics Corporation, another affiliate of FPG.

FCFC has a contract with JOC under which JOC will fabricate vessels in New Jersey for delivery to FCFC in Taiwan. It is performance of this contract that the instant action seeks to enjoin. Correspondence by fax or otherwise between FCFC and JOC regarding this contract has occurred "at least once a week" over a period of a number of months. (A. 19597-600.)

FCFC has contracts for the purchase of equipment for its acetic acid plant with at least eight U.S. vendors in addition to JOC. These vendors received "bid packages" containing specifications that allegedly incorporate misappropriated trade secrets. The process for soliciting bids was that

4

FCFC's engineering team would prepare a bid package and send it to a purchasing group. BP asserts, and FCFC does not dispute, that the purchasing group was actually the purchasing group of FPG, not FCFC. The purchasing group would then send the bid packages to the Taiwanese agents of U.S. vendors, who would in turn send them to their U.S. clients. All meetings between FCFC representatives and representatives of equipment vendors and their agents took place in Taiwan. No FCFC personnel visited the United States for any purpose in connection with the design or construction of the acetic acid plant. There is no evidence that any U.S. vendor received bid packages directly from FCFC, or even from FPG's purchasing group, rather than through Taiwanese agents of the U.S. vendors.

FCFC's contract with Nooter, one of the U.S. equipment vendors, contains a provision requiring arbitration in New York of any disputes concerning that contract. The contracts with the other vendors call for arbitration in Taiwan.

FCFC also has business contacts with the United States that are unrelated to its acetic acid plant project. In the past five years, FCFC entered into four contracts with U.S. companies for the purchase of chemical process technology, at least two of which involved the training of FCFC personnel in the United States. For example, FCFC has recently contracted with ABB Lummus Global, Inc., a New Jersey engineering firm. In performing this contract, Lummus is receiving daily faxes from FCFC in Taiwan.

For more than a decade, FCFC has exported products (primarily rayon and fiber) to customers in the U.S. The parties agree that in 1996, these sales totaled about four million dollars. However, these sales were normally made in Taiwan through Taiwanese agents, and there is no evidence of direct sales by FCFC to purchasers in the United States. FCFC has no sales force, no representative offices, and no warehouses or other facilities in the U.S. There is no evidence that FCFC ever advertised its products in the U.S.

FCFC argues on appeal that the District Court did not have personal jurisdiction over it. Both FCFC and JOC further argue that the District Court erred in issuing the

5

preliminary injunction by (1) determining the likelihood of success on the merits under the law of New Jersey rather than Taiwan, and (2) finding that the injunction was necessary to prevent imminent, irreparable harm. BP cross-appeals, asserting that the District Court erred in limiting the duration of the injunction to thirty months.

I.

The District Court found that "the nature and extent of [FCFC's] contacts with New Jersey and with the United States as a whole allow[ed it] to assert jurisdiction over FCFC under Fed. R. Civ. P. 4(k)(2)." (Dist. Ct. Op. at 10.) We hold that the District Court did not have personal jurisdiction over FCFC.

Rule 4(k)(2) provides that:

> [i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. Proc. 4(k)(2).

> Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state.

World Tanker Carriers Corp. v. MV YA Mawlaya, 99 F.3d 717, 720 (5th Cir. 1996). FCFC argues that while the District Court correctly found that FCFC did not have sufficient contacts with New Jersey to justify assertion of jurisdiction under the State's long-arm statute, it incorrectly concluded (1) that BP's cause of action arose under federal law, and (2) that FCFC had sufficient contacts with the United States as a whole to justify assertion of jurisdiction under Rule 4(k)(2). Because we

agree that the District Court erred in concluding that FCFC's contacts with the United States were sufficient to warrant the assertion of personal jurisdiction over it, we may assume, without deciding, that BP's claim arises under federal law.[1]

Once FCFC moved to dismiss, BP had the burden of coming forth with competent evidence demonstrating that FCFC had sufficient contacts with the United States to justify the court's assertion of either specific or general personal jurisdiction. See Stranahan Gear Co. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1998). Specific personal jurisdiction exists when the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that `arise out of or related to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985). General personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are "continuous and systematic." Helicopteros Macionales de Columbia v. Hall,

_____

1. Great Britain and the United States are signatories to the Paris Convention. BP characterizes its claim as arising under Articles 2 and 10 bis of the Paris Convention and S 44 of the Lanham Act. Article 2 provides that nationals of signatory countries "shall, as regards to the protection of industrial property, enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals." Paris Convention, Art. 2, I.E.L. IV-A. Article 10 bis provides that "[t]he countries of the Union are bound to assure to nationals of such countries effective protection against unfair competition." Id. Art. 10 bis. In L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,
214 F.2d 649 (3d Cir. 1954), we found that S 44 subsections (b) and (h) were intended by Congress "to implement international agreements [like the Paris Convention] that are not self-executing" and "to fashion a remedy to coincide with rights growing from the . . . substantive provisions of [those] agreements." Id.  at 654. BP thus asserts that as a matter of federal law it is entitled to the same protection that New Jersey
law affords to U.S. citizens. Its pleadings expressly disavow any right to relief based on conduct of FCFC in Taiwan so it claims no extraterritorial effect for the Lanham Act. Compare Van ity Fair Mills, Inc. v. T. Eaton Co.,
234 F.2d 633, 644 (2d Cir. 1956). Given FCFC's limited contacts with the United States, we find it unnecessary to decide whether BP's claim against it arises under federal law and, if so, whether it states a claim against FCFC upon which relief could be granted.

7

466 U.S. 408, 416 (1984). We examine in turn whether the District Court has specific or general personal jurisdiction over FCFC.

A.

FCFC's contacts with the United States do not give rise to specific jurisdiction. The constitutional touchstone of due process analysis is "whether the defendant purposefully established `minimum contacts' in the forum." Burger King Corp., 471 U.S. at 474. "[T]he foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there." Id. (quoting World-Wide Volkswagen Corp. v. Woodson , 444 U.S. 286, 295 (1980)). "It is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." Id. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "This `purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of `random,'`fortuitous,' or `attenuated' contacts . . . ." Id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).

The Supreme Court has given several reasons why a forum may legitimately exercise jurisdiction over a nonresident who "purposefully directs" his activities toward forum residents. "A State generally has a `manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." Id. at 473 (quoting Keeton, 465 U.S. at 776). "Moreover, where individuals `purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities." Id. at 473-74. Finally, "because `modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." Id. at 474 (quoting

8

McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)).

"With respect to interstate contractual obligations, [the Supreme Court] ha[s] emphasized that parties who `reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." Id. at 473 (quoting Travelers Health Ass'n v. Virginia, 339 U.S. 643, 647 (1950)). On the other hand, "[i]f the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, . . . the answer is clearly that it cannot." Id. at 478. The Supreme Court has endorsed "a `highly realistic' approach that recognizes that a `contract' is `ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' " Id. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316 (1943)). "It is these factors--prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing--that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." Id.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum . . . , these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with `fair play and substantial justice.' " Id. (quoting International Shoe, 326 U.S. at 320). "Thus courts `in appropriate case[s]' may evaluate `the burden on the defendant,' `the forum State's interest in adjudicating the dispute,' `the plaintiff's interest in obtaining convenient and effective relief,' `the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the `shared interest of the several States in furthering fundamental substantial social policies.' " Id. at 476-77 (quoting World-Wide Volkswagen, 444 U.S. at 292). "These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of

9

minimum contacts than would otherwise be required." Id. at 477. "On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. "Nevertheless, minimum requirements inherent in the concept of `fair play and substantial justice' may defeat reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities." Id. at 477-78.

Applying these principles in Burger King, the Supreme Court found jurisdiction proper where the defendant, "[e]schewing the option of operating an independent local enterprise, . . . deliberately `reach[ed] out beyond' [his home forum] and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." Id. at 479-80. The Court emphasized that he entered "a 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," which relationship could be viewed as neither "random," "fortuitous," or "attentuated." Id. Moreover, the Court stated that the Court of Appeals, in finding jurisdiction improper, "gave insufficient weight to provisions in the various franchise documents providing that all disputes would be governed by Florida law." Id. at 481. The Court reasoned that "[a]lthough such a provision standing alone would be insufficient to confer jurisdiction, . . . when combined with the 20-year interdependent relationship [the defendant] established with Burger King's Miami headquarters, it reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Id.

In this case FCFC's alleged misappropriation and improper use of BP's trade secrets have occurred and continue to occur in Taiwan. The primary alleged injury to BP has occurred and continues to occur in Great Britain. See Horne v. Adolph Coors Co., 684 F.2d 255, 259-60 (3d Cir. 1982) (holding that in a trade secret case, the injury occurs to the owner of the trade secret wherever he resides). Thus, the primary tortious conduct giving rise to BP's claim against FCFC and to the injury caused thereby

10

is unrelated to the United States. The only FCFC contacts with the United States that are in any way related to BP's claim against it are that (1) it placed orders in Taiwan with eight United States based equipment suppliers to enable it to build the offending plant in Taiwan, (2) in furtherance of those orders it has sent correspondence from Taiwan into the United States, and (3) in one of those eight orders it agreed to arbitrate with that supplier in New York. Thus, in substance, this is a case where FCFC availed itself of the assistance of eight U.S. based companies who solicited its business in Taiwan in order to build a plant in Taiwan allegedly with resulting injury to BP in Great Britain. Accordingly, we find no act by which FCFC "purposefully avail[ed] itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475.

Burger King teaches that "a non-resident's contracting with a forum resident, without more, is insufficient to establish the requisite `minimum contacts.' " Sunbelt Corp. v. Noble, Dentor & Assoc., Inc., 5 F.3d 28, 32 (3d Cir. 1993). The same is true of "informational communications in furtherance of [such a] contract." Id. at 32. Besides the contracts and implementing correspondence, there are no significant contacts here with the United States. The fact that these contracts were for a one-time purchase of equipment that was to be shipped to Taiwan and were solicited and negotiated through the Taiwanese agents of the U.S. vendors seems to us to negate any inference of "purposeful availment."

In our view, FCFC's undertaking, in its contract with Nooter, to arbitrate in New York any disputes arising under the contract is the single fact that offers most substantial support for the proposition that the manner in which FCFC conducted its program of purchases of American equipment for its acetic acid plant reflected a measure of acquiescence in the possible need to submit to the jurisdiction of American courts, should disputes arise. But we think that this fact is not sufficient to carry the day. We of course recognize that, in the event of a dispute between FCFC and Nooter, the contractual agreement between FCFC and Nooter would probably -- and properly -- be regarded as a

11

waiver of objections to judicial jurisdiction as well, whether that jurisdiction was to be exercised by a New York state court or, in the alternative, by a federal court, located anywhere in the United States, with respect to a claim arising under federal law. But the dispute in the case at bar does not involve Nooter, and the FCFC–JOC contract contains no comparable venue-selection provision. More to the point, the provision in the FCFC–Nooter contract only involved venue selection. It was not a provision stipulating that New York law, or the law of any other American jurisdiction, would govern such disputes as might arise. Accordingly, we are not persuaded that the provision constitutes purposeful availment of the benefits and protections of United States law. Given the attenuated connection between the arbitration clause and the instant litigation, it is insufficient to make the Court's exercise of jurisdiction comport with "traditional notions of fair play and substantial justice." Cf. Kahn Lucas Lancaster v. Lark Int'l Ltd., 956 F. Supp. 1131, 1138–39 (S.D.N.Y. 1997) (New York arbitration clause is insufficient basis for jurisdiction over suit even between the parties to the contract containing the clause until the plaintiff indicates a desire to arbitrate the suit).

Finally, we note that the United States has, at best, a very limited interest in adjudicating this dispute between two non-citizens, which is primarily a dispute regarding acts that took place in Taiwan that caused an injury in Great Britain. Although BP emphasizes that this suit seeks only to enjoin and recover damages for FCFC's actions in the United States, and not its acts of misappropriation in Taiwan, it cites no authority for the proposition that a plaintiff can strengthen the relationship between the defendant, the forum and the litigation by limiting the relief sought. Regardless of whether BP seeks relief for the actions of FCFC in Taiwan, the fact remains that FCFC has done nothing of substance other than contract in Taiwan with the Unites States based vendors to make one-time deliveries of equipment in Taiwan. Under Burger King, those purchases and the associated correspondence sent from Taiwan are insufficient to create specific personal jurisdiction.

12

We find substantial support for our holding in Burlington Indus., Inc. v. Maple Indus., Inc., 97 F.3d 1100, 1103 (8th Cir. 1996). The plaintiff there brought a claim for misappropriation of trade secrets in the Eastern District of Arkansas. As a basis for specific jurisdiction, the plaintiff pointed to the fact that the four machines incorporating the misappropriated trade secrets were purchased from a third-party Arkansas resident. See id. However, none of the defendant's employees went to Arkansas to negotiate their purchase or supervise their manufacture. See id. The Court acknowledged that telephone calls between the defendant and the vendor, numbering at least one hundred,"can be evidence of a continuous and systematic business relationship," but it found that while these phone contacts "remain a consideration, they are insufficient, alone, to confer personal jurisdiction." Id.

B.

We conclude, as well, that FCFC's United States contacts are not such that an assertion of general personal jurisdiction comports with the demands of due process. As we have noted, even where the connection between a defendant's contacts and the litigation are insufficient to give rise to specific jurisdiction, general jurisdiction will be available where the defendant's contacts unrelated to the litigation are "continuous and systematic." Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 416 (1984).

While FCFC exports its products to the United States, it is undisputed that it has no personnel or facilities here and there is no evidence that it has in any way advertised or solicited business here. As a result there is simply no basis for concluding that it has a continuous presence in the United States.

Contrary to BP's suggestion, FCFC's relationship with FPG and its chairman, Mr. Wang, does not provide the requisite presence here. FCFC is a legally separate entity. The mere fact that FCFC had an arrangement with FPG, the details of which are not revealed in the record, whereby FCFC would submit bid packages to FPG's purchasing group, who would in turn submit them to other agents, and

13

the fact that FCFC leased software from Nan Ya, another FPG affiliate, is not a sufficient basis on which to pierce the corporate veil and assert jurisdiction over FCFC on the basis of the United States contacts of other FPG affiliates. See Cohn v. Insurance Co., 54 F.3d 1108, 1116 (3d Cir. 1995) ("party seeking to pierce corporate veil must establish that controlling corporation wholly ignored separate status of controlled corporation and so dominated and controlled its affairs that separate existence is a mere sham"). Moreover, FCFC's passive ownership of 3.5% of the stock of a Delaware corporation cannot constitute the kind of continuous and systematic business contacts that give rise to general jurisdiction. See Shaffer v. Heitner , 433 U.S. 186, 213 (1977); Grimes v. Vitalink Communications Corp., 17 F.3d 1553, 1559 (3d Cir. 1994). Finally, the fact that FCFC has entered into four other recent contracts for the purchase of chemical technology, two of which involved FCFC personnel traveling to the United States for training, is insufficient. See Helicopteros, 466 U.S. at 416–17 (visits in connection with training and purchases, even if occurring at regular intervals, are insufficient basis for general jurisdiction). Even considering the cumulative effect of these various contacts together, the requirements for general jurisdiction are not met.

II.

"In order to obtain a preliminary injunction, the moving party must show (1) irreparable injury, (2) a reasonable probability of success on the merits, (3) the harm to it outweighs the possible harm to other interested parties, and (4) harm to the public." Frank Russell Co. v. Wellington Management Co., 154 F.3d 97, 101 (3d Cir. 1998). A District Court then balances these four factors to determine if an injunction should issue. See id. JOC asserts that the District Court erred in finding that BP had demonstrated both imminent and irreparable injury and a likelihood of success on the merits.

A.

We find that the record supports the District Court's conclusion that an injunction was necessary to prevent

14

imminent and irreparable harm. The District Court did not clearly err in crediting BP's witness who testified as to the damage that would be done to BP's reputation, credibility and ability to license its technology if FCFC's plant became operational, giving rise to the public perception that BP was unable to protect its proprietary trade secrets. Such injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy. See Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991) (holding that injury to goodwill is irreparable). Moreover, although the evidence suggests that FCFC's plant would not have become operational for at least a year after the injunction was issued, the history of the instant proceedings belies JOC's unsupported assertion that a year was ample time to obtain a trial on the merits in Taiwan in the event that the equipment were allowed to leave this country. See Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996); Wright et al., Federal Practice and Procedure S 2948.1, at 139 (2d ed. 1995) (explaining that imminence requires that the harm will occur before a trial on the merits can be had). The operation of FCFC's plant is not so remote in time as to be uncertain or speculative. See Continental Group, Inc. v. Amoco Chems. Corp., 614 F.2d 351, 359 (3d Cir. 1980). Finally, the District Court's finding that any delay on BP's part in filing suit "was caused by BP's conscientious decision to fully investigate the very serious charges before filing suit" is not clearly erroneous. BP Chems., Ltd. v. Formosa Chem. & Fibre Corp., No. 97-cv-4554, at 41 (D.N.J. Sept. 15, 1998). To the extent that delay can justify denial of a motion for a preliminary injunction, see, e.g., Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985), "a delay caused by a plaintiff's good faith efforts to investigate an infringement" or to determine how serious an infringement is does not preclude a finding of irreparable harm. Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc. , 60 F.3d 27, 39 (2d Cir. 1995).

B.

In determining whether BP had shown a likelihood of success, however, the District Court concluded that New

Jersey had the most significant relationship with the case and applied New Jersey law in analyzing each issue. We conclude that it erred in doing so.2

BP bases its claim against JOC on the following Restatement rule to which it maintains the New Jersey courts are committed:

> One who discloses or uses another's trade secret without a privilege to do so is liable to the other if . . . (c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure was otherwise a breach of duty to the other.

Restatement (First) of Torts S 757 (1939); see also Williams v. Curtiss-Wright Corp., 681 F.2d 161, 164 & n.3 (3d Cir. 1982) (holding that New Jersey has substantially adopted Restatement section 757(c)).

JOC does not dispute, as we understand it, that New Jersey courts follow this rule.3 It stresses, however, that

_____

2. FCFC and JOC argued before us, under appropriate argument headings, that BP had not shown a likelihood of success on the merits and, under appropriate subheadings, that the record would not support a finding (1) that any information Tu gave FCFC was a trade secret, or (2) that Tu breached a duty by giving information to FCFC. Both briefs (see FCFC's opening brief at 50 and JOC's opening brief at 17–18) took the position that, contrary to the ruling of the District Court, both of these issues are governed by Taiwanese law. FCFC's brief cited authority in support of this position, and JOC expressly incorporated that authority. Having considered the conflicts of law issues thus raised, we have concluded that the District Court has entered an injunction, and is currently proceeding to the merits issues, based on an erroneous view of the law. Under these circumstances, we deem it appropriate and prudent to advise the District Court at this time regarding our view of the conflicts of law issues.

3. It does dispute the application of the rule to the facts of this case, asserting that JOC did not have notice that FCFC had discovered the secret by improper means at the time it learned the secret from FCFC, and that therefore Restatement section 758 rather than section 757 applies. Section 758 governs where the defendant does not have notice that the third party who disclosed the secret obtained it by improper

16

under New Jersey's flexible "governmental-interest analysis, . . . the determinative law is that of the state with the greatest interest in governing the particular issue to be decided." Veazey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1986) (emphasis supplied); accord O'Connor v. Busch Gardens, 605 A.2d 773, 774 (N.J. Super. Ct. App. Div. 1992) ("[C]hoice of law decisions can and should be made on an issue-by-issue basis, and thus the law of different states can apply to different issues in the same case.); see also Restatement (Second) of Conflict of LawsS 145, S145 cmt. d. JOC points out that in addition to issues regarding its knowledge and conduct, the likelihood of BP's success on its claim depends on whether it can establish (1) that it had a protectable interest in its proprietary information -- i.e., a "trade secret" (and, in particular, that Monsanto and CPDC took the requisite security measures to protect the methanol carbonylation technology) and (2) that FCFC tortiously acquired BP's trade secret (and, in particular, that FCFC's consultant, Mr. Tu, owed a duty of confidentiality with respect to the technology and that FCFC had knowledge of a breach of duty in receiving and using BP's technology). Thus, while it appears to be undisputed that New Jersey law governs the issues of JOC's knowledge and conduct, this does not necessarily signify that New Jersey law -- as opposed to Taiwanese law -- applies to the two additional issues necessary to BP's case against JOC.

JOC has tendered affidavits tending to show that Taiwanese law governing the protectability of commercially valuable information and what constitutes a tortious

_____

means until after the defendant learns the secret. See Restatement (First) of Torts S 758 & cmt. a. Section 758 protects from liability an innocent third party who learns of the secret if prior to receiving notice "he has so
changed his position that to subject him to liability would be inequitable." Id. S 758(b). JOC argues that its substantial investment of time and money in the manufacturing process thus precludes liability. The events from which the District Court inferred notice, however, all occurred prior to JOC's entering into its contract with FCFC. Thus, sections 757 and 758 do not differ in any respect that is relevant to the issue before us in this appeal.

17

conversion of such a protectable interest is different from, and more difficult for BP than, the New Jersey law governing those issues. As to the issue of protectability, the affidavits indicate, for example, that "[a] single unprotected disclosure [by either BP, Monsanto, CPDC or other Monsanto licensees] of the secret terminates its trade secret status immediately (like a needle hits a balloon)," (A. 6024), and that "BP is required to show that CPDC actually took steps to safeguard the information," (A. 1046 (emphasis added)). As to the issue of whether FCFC tortiously acquired the information from Tu, the affidavits indicate that:

> BP is required to show that CPDC actually entered into a confidentiality agreement with Mr. Tu. There must be evidence that Mr. Tu was put on notice or instructed as to what materials he should consider confidential. Under Taiwanese law, corporate obligations do not attach to a corporation's employee. The employee has to be subject to [sic] specific agreement or clear instructions as to exactly what he was required to keep confidential.

(A. 1046).

We recognize that BP has tendered conflicting affidavits tending to show that JOC's affidavits do not accurately characterize Taiwanese law and that Taiwanese and New Jersey law are the same as to these issues. It is enough for present purposes, however, to find that there is record evidence that, if believed, would support a finding that there are relevant differences in the laws of the two sovereigns that the parties claim to be governing. This requires us to determine whether Taiwan or New Jersey has the more substantial interest in determining:

> (1) whether proprietary information licensed by its purported owner for use in Taiwan was protectable and whether at the time of its alleged conversion in Taiwan it had been returned to the public domain; and

> (2) whether FCFC's acquisition of the alleged trade secret in Taiwan was wrongful.

In both instances, we conclude based on the current record that Taiwan had the more substantial interest in having its

18

law applied and that a New Jersey court would apply that law in a case like this.

We believe Taiwan has the greater interest in setting the standards regarding whether information that has been licensed by a British company to a Taiwanese company has been sufficiently safeguarded to warrant legal protection or whether it has entered the Taiwanese public domain. This issue implicates policy judgments regarding the appropriate balance between protecting trade secrets, thereby encouraging both the development of new technology and the willingness of foreign companies to share their technology with Taiwanese businesses, and free interchange and access to information, which also has profound implications for the health of the Taiwanese economy. New Jersey's interest, on the other hand, would appear to be virtually nil. As we have previously pointed out, BP, the purported owner of the trade secret, is not a resident of New Jersey and, while it may suffer some marginal injury there, New Jersey is assuredly not the principal situs of either the direct or the indirect injury inflicted.4 Moreover, we are doubtful that a New Jersey court would apply New Jersey law even if BP were a New Jersey corporation. A state's interest in protecting its citizens from injury by protecting intellectual property which they choose to license to foreign companies cannot outweigh the interests of the foreign sovereign in setting the standards for the protection of intellectual property within its own borders. Cf. O'Connor, 605 A.2d at 775.

The New Jersey Superior Court's decision in O'Connor is instructive. There, a New Jersey resident was injured in Virginia. The injuries were allegedly caused by both the New Jersey plaintiff's and the Virginia defendant's negligence. The issue was whether the court should apply Virginia's strict rule of common-law contributory negligence

_____

4. As we have previously pointed out, Great Britain, where BP is domiciled, is the principal situs of the injury alleged by BP. However, as we point out below, conventional choice of law doctrine ordinarily does not give great weight to the place of injury in cases, like the case at bar,
arising out of claims of misappropriation of trade values. In any event, no party has suggested that British law governs any of the issues presented in this case.

19

or New Jersey's comparative negligence rule, which afforded more protection to the injured plaintiff. The court held that:

> New Jersey's concern for its injured citizens is also legitimate, but it cannot exempt them from other states' law setting standards for local conditions and conduct. If New Jersey's comparative negligence doctrine followed [the plaintiff] [i]nto. . . Virginia, it would follow her into every other state as well, and would supplant local liability rules wherever she went. That would be an impermissible intrusion into the affairs of other states.

Id.; cf. Restatement (Third) of the Foreign Relations Law of the United States SS 402, 403 (1987) (discussing bases of and limitations on the jurisdiction to prescribe law with respect to a person or activity having connections with other states). Similarly, in this case, neither New Jersey nor Great Britain's concern for their injured citizens can outweigh Taiwan's interest in setting standards for the protection of intellectual property in Taiwan.

Similarly, Taiwan has the greater interest in having its law applied to determine whether FCFC, a Taiwanese company, acted tortiously in acquiring information in Taiwan from CPDC, another Taiwanese company, and, in particular, as to the circumstances under which a Taiwanese company's actions have created a duty of confidentiality in its employees. Again the law in this area reflects a delicate balance of competing interests that has the capacity to profoundly affect the Taiwanese economy, and any interest that New Jersey would have in protecting trade secret holders who export their intellectual property to Taiwan is greatly outweighed by Taiwan's interest in setting the standards that govern the conduct of its own citizens regarding intellectual property that is present within its borders.

The conclusion that Taiwan's interest in both of these issues is greater than New Jersey's finds further support in the Restatement (Second) of Conflict of Laws , to which New Jersey courts have often looked for guidance. See, e.g., Veazey, 510 A.2d at 251; Rose, 293 A.2d at 367–77; O'Connor, 605 A.2d at 774. The Restatement  suggests that

the following factors should be taken into account in determining which state has the most significant relationship with a particular issue in tort law:

>(a) the place where the injury occurred,

>(b) the place where the conduct causing the injury occurred,

>(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

>(d) the place where the relationship, if any, betw een the parties is centered.

Restatement (Second) of Conflicts S 145 (1971).

"[T]he place where the conduct occurred is given particular weight in the case of torts involving . .. unfair competition." Id. S 145, cmt. (e), at 420. Moreover, while the general rule is that in determining whether an interest is entitled to legal protection, "the applicable law will usually be the local law of the state where the injury occurred," id. S 158 (emphasis added), the Restatement qualifies this rule, stating:

>"[s]ituations do arise, however, where the place of injury will not play an important role in the selection of the state of applicable law. . . . This will . . . be so when . . . there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury, or when, such as in the case of multistate defamation, injury has occurred in two or more states.

Id. The Restatement further states that"the place of injury is less significant in the case of . . . such unfair competition as consists of false advertising and the misappropriation of trade values." Id. S145 cmt f. The Restatement's explanation for the unimportance of the place of injury in cases of misappropriation of trade values is directly applicable here:

>The injury suffered through false advertising is the loss of customers or of trade. Such customers or trade will frequently be lost in two or more states. The effect of the loss, which is pecuniary in its nature, will normally

21

be felt most severely at the plaintiff's headquarters or principal place of business. But this place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade. The situation is essentially the same when misappropriation of the plaintiff's trade values is involved, except that the plaintiff may have suffered no pecuniary loss but the defendant rather may have obtained an unfair profit.

Id. Equally applicable here is the conclusion that in such cases, "the place of injury does not play so important a role for choice-of-law purposes . . . as in the case of other kinds of torts[ and that i]nstead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise." Id.

The vast majority of the conduct that is relevant to these two issues occurred in Taiwan.5 BP licenced the trade secrets to CPDC in Taiwan. To the extent that BP and CPDC took measures to safeguard those secrets in CPDC's hands, those measures were taken in Taiwan. FCFC acquired whatever information it acquired in Taiwan, designed its plant in Taiwan, prepared the bid packages with the specifications for the equipment in Taiwan, and delivered those packages to Taiwanese agents of U.S. companies in Taiwan.

Moreover, while neither BP nor JOC is Taiwanese, which by itself weighs against the application of Taiwanese law, both have established significant relationships with Taiwan, BP by licensing its technology to a Taiwanese company and JOC by maintaining agents in Taiwan for the purpose of soliciting Taiwanese business. These relationships are centered in Taiwan, and these relationships gave rise to the events that are at issue here.

We hold that Taiwan has the greater interest in having its
_____

5. Although BP has alleged misconduct occurring in New Jersey, namely JOC's fabrication of equipment using misappropriated technical specifications, this conduct has no relevance to either of the issues regarding which JOC asserts that Taiwanese law applies.

22

law govern the issues of whether BP had a protectable interest in the information licensed to CPDC and whether FCFC acted unlawfully in acquiring it. Therefore, to the extent that there is a conflict of law on these issues, Taiwanese law should govern.

As we have previously noted, there is evidence in the current record that, if believed, would support a conclusion that Taiwanese and New Jersey law do not differ in any respect material here. The District Court had no occasion to resolve the conflict presented in the affidavits before it because it erroneously concluded that New Jersey law governed all issues. While we conclude that we are authorized to resolve that conflict, see Fed. R. Civ. Proc. 44.1 (the content of foreign law is an "issue of law"); Franzen v. Equitable Life Assurance Soc'y, 33 A.2d 599, 602 (N.J. 1943) (same), we believe the District Court is in the best position to determine what at this point is essentially a credibility issue -- i.e., which expert to believe. The District Court will thus be required to determine hereafter whether Taiwanese law differs from that of New Jersey. It may address this issue in the context of a renewed application for a preliminary injunction and/or in the context of a merits determination. In either context, it will have discretion to supplement the existing record with testimony or otherwise and/or to conduct its own independent investigation regarding Taiwanese law. See Fed. R. Civ. Proc. 44.1; N.J. R. Evid. 201(a); Franzen, 33 A.2d at 602.

III.

We will reverse the District Court's order of May 14, 1999, and direct that it: (a) dismiss FCFC for want of personal jurisdiction, and (b) conduct further proceedings with respect to BP's claim against JOC in a manner consistent with this opinion.6

_____

6. Because we are setting aside the injunction entered by the District Court and remanding for further proceedings, we need not address the question, posed by BP's cross-appeal, whether the District Court erred in limiting the duration of the injunction to thirty months.

23

ALITO, Circuit Judge, concurring in the judgment:

Except with respect to the comments below, writing separately in this case would not serve a useful purpose. I do not join part IIIB of the opinion of the Court. Both FCFC and JOC merely mentioned the choice-of-law issue in passing in their briefs. See FCFC Br. At 41, 50 n.7; JOC Br. At 17. " `[A] passing reference to an issue . . . will not suffice to bring that issue before this Court.' " Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (citation omitted) (ellipsis in original). I would hold that no choice-of-law issue is properly before the Court in this appeal. Without full briefing from the parties, I am unwilling to join the Court's novel application of New Jersey choice-of-law principles.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

24