Michael W. **HARRIS**

v.

**TRANS UNION, LLC, et al.**

No. CIV.A. 01–5204.

United States District Court, E.D. Pennsylvania.

March 22, 2002.

James A. Francis, Mark D. Mailman, Francis & Mailman, P.C., Philadelphia, PA, for plaintiff.

Timothy P. Creech, Marion, Satzberg, Trichon, Kogan & Wertheimer, Philadelphia, PA, for defendants.

### *MEMORANDUM*

BARTLE, District Judge.

Plaintiff has brought this action under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* and has also alleged various state law claims against defendants Trans Union, LLC ("Trans Union") and TXU Electric & Gas ("TXU"). Before the court is the motion of defendant TXU to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure and for improper venue under Rule 12(b)(3).

I.

Plaintiff Michael Harris, a resident of Philadelphia, alleges that TXU has reported inaccurate information to Trans Union about an account in his name for which he disputes responsibility. As a result, Har-

ris asserts that he has been denied various forms of credit and been subjected to elevated interest rates and finance charges due to his poor credit rating. He also contends that TXU's erroneous reporting has caused him to suffer loss to his reputation. He maintains that TXU's actions not only violate the Fair Credit Reporting Act ("FCRA") but also constitute defamation, tortious interference with contractual relations and negligence.

TXU, a Texas corporation, is in the business of providing retail electric service within the state of Texas. TXU has no offices, employees or bank accounts in Pennsylvania, is not authorized to do business in the Commonwealth, and does not sell goods or services here.

According to the Declaration of TXU Credit Services Supervisor Thomas Delaney, an account was opened in the name of Michael Harris on March 2, 1990 for electric service at 1102 Golf Course Road, Apartment 34, Copperas Cove, Texas. TXU no longer has the document which authorized the opening of this account. At the time the account was opened, TXU waived the deposit requirement because it was advised that Harris was in the United States Army, stationed at Ft. Hood. The TXU records show that the account for electric service remained open from March, 1990 through December 14, 1994, when it was terminated by a Brenda Harris who was Harris' ex-wife. At that time, Ms. Harris gave TXU a new address in New York. When TXU sent its final bill of $92.16 to that address, it was returned as undelivered, and the bill was never paid. On March 21, 1995, TXU reported the account delinquency to Trans Union, a credit reporting agency, at their Chicago, Illinois office.

In the affidavit attached to his response to TXU's motion to dismiss as well as in a supplemental affidavit, Harris states that he never lived at 1102 Golf Course Road and never maintained utility service there. Harris asserts that he disputed the TXU debt by contacting both Trans Union and TXU. These contacts included at least two telephone calls by Harris to TXU's offices in Texas. Based on its telephone records, it is TXU's position that Harris only called to dispute the bill on one occasion, March 30, 2001.

In both October, 1999 and January, 2001, Trans Union sent to TXU its Consumer Dispute Verification form ("CDV") in order to verify the amount Harris owed. The forms contained Harris' name, address and social security number and described the debt. The instructions on the CDV forms requested TXU to "please check the 'same' box for each identification item appearing on the CDV which is identical to your records; or provide differing information in the shaded area." TXU Analyst Eddie Huff completed, signed and dated both forms and returned them, as requested, to Trans Union's offices in Pennsylvania. Each completed form contained three check marks which confirmed Harris' name and his social security number and verified the debt as reported. However, TXU left blank the boxes seeking verification of Harris' previous and current Philadelphia addresses and did not provide any other address for Harris in the shaded area.

II.

■ A federal district court may assert personal jurisdiction over a nonresident defendant to the extent authorized by the law of that state in which the action is brought, consistent with the demands of the Constitution. *See Provident Nat'l Bank v. Calif. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 436 (3d Cir.1987) (citing Fed. R.Civ.P. 4(e)). Pennsylvania law permits courts to "exercise personal jurisdiction

over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment." *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992) (citations omitted); *see also* 42 Pa. Cons.Stat. Ann. § 5322(b). Furthermore, the Pennsylvania long-arm statute specifically provides for personal jurisdiction over a person "[c]ausing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth." 42 Pa. Cons. Stat. Ann. § 5322(a)(4).

■ Once a jurisdictional issue has been raised, the plaintiff bears the burden of establishing with reasonable particularity contacts sufficient to support the court's exercise of personal jurisdiction. *See Provident Nat'l Bank,* 819 F.2d at 437. General averments in an unverified complaint or response without the support of "sworn affidavits or other competent evidence" are insufficient to establish jurisdictional facts. *Time Share Vacation Club v. Atl. Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984). Otherwise, for the purposes of this motion, we must accept all of the substantive allegations in Harris' complaint as true and construe disputed facts related to those claims in his favor. *Imo Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 257 (3d Cir.1998); *Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir.1992).

■ Harris contends that TXU is subject to specific personal jurisdiction within Pennsylvania. "Specific personal jurisdiction exists when the defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or related to" those activities.'" *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 259 (3d Cir.2000) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85

L.Ed.2d 528 (1985)). For a court properly to exercise specific jurisdiction under the Due Process Clause, the plaintiff must satisfy a two-part test. *See Imo Indus.,* 155 F.3d at 259. First, the plaintiff must demonstrate that the defendant had the constitutionally sufficient "minimum contacts" with the forum. *Id.; see Burger King,* 471 U.S. at 474, 105 S.Ct. 2174. Second, the court, in its discretion, must determine that the exercise of specific jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted); *see Imo Indus.,* 155 F.3d at 259.

■■ A defendant may be said to have established "minimum contacts" if there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State," thus ensuring that "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (citations omitted); (*Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). The only actions taken by TXU which could be viewed as constituting purposeful availment "of the privilege of conducting activities within" Pennsylvania are the mailing to Trans Union of the two completed CDV forms in 1999 and 2001 which confirmed Harris' $92 debt to TXU and the one or two telephone conversations between Harris and TXU. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (citations omitted).

Since Harris has asserted intentional tort claims against TXU, we must consider the impact of the Supreme Court's decision in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct.

1482, 79 L.Ed.2d 804 (1984), on the minimum contact analysis. In *Calder*, the plaintiff, an entertainer living and working in California, brought a defamation action in a California state court against the National Enquirer, one of its writers, and one of its editors for an article accusing her of having difficulties with alcohol. The National Enquirer had its largest circulation in that state. The individual defendants were residents of Florida, the forum in which the article was researched, written, reviewed, and approved. Both individuals moved to dismiss plaintiff's actions for lack of personal jurisdiction. The Supreme Court upheld the exercise of jurisdiction, concluding:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.... [T]heir intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation.

*Calder*, 465 U.S. at 788–90, 104 S.Ct. 1482 (citations and footnote omitted).

The Court of Appeals in *Imo Industries* narrowly interpreted the "effects test" established in *Calder*. It held that under this test a court may exercise personal jurisdiction only if:

> (1) The [nonresident] defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort;
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

155 F.3d at 265–66 (footnote omitted). Proof of these three elements would "enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied." *Id.* at 260 (citing *Keeton*, 465 U.S. at 780, 104 S.Ct. 1473).

In *Imo Industries*, the court rejected plaintiff's argument that the defendant, a German corporation, had "expressly aimed" its conduct toward New Jersey, plaintiff's headquarters and selected forum.[1] 155 F.3d at 267. The plaintiff corporation had brought a tortious interference with contract claim against defendant, alleging that defendant's promise to revoke its license agreement with plaintiff's Italian subsidiary prevented plaintiff from consummating the sale of that entity. Letters from the defendant regarding the possible revocation of the license were sent only to New York and Italy, although they were later forwarded to plaintiff's headquarters in New Jersey. *Id.* at 257–58. Phone calls between New

---

1. Having found that plaintiff failed to prove the third prong of the test, the court refrained from addressing whether the "brunt of the harm" was suffered in New Jersey.

Jersey and Germany were all initiated by plaintiff, and the meetings between the parties took place in Canada and Germany. *Id.* at 258. While conceding that the defendant may have known that its conduct would have effects in New Jersey, the court found that the actual behavior of the defendant was not directed towards New Jersey nor had defendant "expressly aimed its tortious conduct" at the state. *Id.* at 268.

In analyzing the case before us, we apply the three-prong test in *Imo Industries.* Harris has asserted the commission of the intentional torts of defamation and tortious interference with contractual relations as well as violation of the FCRA. Therefore, he satisfies the first prong of the *Imo Industries* test. Furthermore, Harris states in his affidavit that "[a]ll of the damages that I have suffered, financially, emotionally as well as that to my reputation, as far as I am aware, occurred within the Commonwealth of Pennsylvania." Since Harris "felt the brunt of the harm in the forum," he has met the second prong. *Imo Indus.,* 155 F.3d at 265.

The third prong of the *Imo Industries* test requires us to determine whether TXU "expressly aimed [its] tortious conduct" at Pennsylvania so that it was "the focal point of the tortious activity." 155 F.3d at 266. While TXU verified Harris' name, social security number and debt, and mailed the verified CDV forms to Trans Union in Pennsylvania, it did not place a check mark in the box confirming his current and previous Philadelphia addresses. According to the Declaration of Thomas Delaney, a Credit Services Supervisor at TXU, "[t]he TXU business records did not contain an address for Mr. Harris." Harris counters that even though TXU did not verify his address on the CDV forms, it knew that he lived in Pennsylvania and that any derogatory credit information would injure him in Pennsylvania. However, there is no evidence in the record that TXU had any such knowledge. Additionally, it is clear that TXU never attempted to collect the $92 outstanding debt from Harris in this forum. In fact, the two CDV forms state that the $92 debt was written off years before in March of 1995.

Harris also argues that TXU expressly aimed its tortious conduct at Pennsylvania when it mailed the two CDV forms to Trans Union in the Commonwealth. We disagree. It was Trans Union which initiated the request for information, and TXU simply sent the information to the location requested by Trans Union. It was not targeted at Pennsylvania. The mere fact that a Trans Union office in the forum was the recipient of the forms does not create personal jurisdiction here in an action brought by Harris against TXU. *See Lockard v. Equifax, Inc.,* 163 F.3d 1259, 1265–66 (11th Cir.1998); *Imo Indus.,* 155 F.3d at 266. The only other contacts on which Harris relies are the one or two telephone calls initiated by Harris to TXU. Such "unilateral activity" by Harris "cannot satisfy the requirement of contact with the forum State" by TXU and therefore cannot provide a basis for this court's exercise of personal jurisdiction. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Imo Indus.,* 155 F.3d at 260 n. 3. While the mailings and the phone conversations may have affected Harris in Pennsylvania, that result simply goes to the second prong of the *Imo Industries* test. The third prong requires more. That prong has not been satisfied since TXU did not "expressly aim[ ][its] tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *Imo Indus.,* 155 F.3d at 266.

The Court of Appeals' recent decision in *Remick v. Manfredy*, 238 F.3d 248 (3d Cir.2001), supports our conclusion. In that case, a Philadelphia lawyer sued an Illinois law firm and two of its lawyers, among others, as a result of a dispute following a client's discharge of the Philadelphia lawyer and the engagement of the Illinois firm. The Third Circuit affirmed the holding of the district court that it lacked personal jurisdiction over the individual defendants with regard to plaintiff's defamation claim. *Id.* at 258–59. The Court of Appeals focused on an allegedly libelous letter to plaintiff from his client which terminated plaintiff's representation. That letter was faxed to plaintiff's Philadelphia law office. Plaintiff argued that since two staff members in his office read the letter while it was on the fax machine, it was published in the state and therefore personal jurisdiction over the individual defendants as to his defamation claim was proper. In rejecting this argument, the Court of Appeals found that the third prong of the *Imo Industries* test had not been met. It explained that "[t]here is no indication that the letter was targeted at them or at anyone in Pennsylvania other than [plaintiff]," and that "it cannot be said that the defendants here expressly aimed their conduct at Pennsylvania so that Pennsylvania was the focal point of the tortious activity." *Id.* at 259. That situation is similar to the one before us in the instant action.

The *Remick* court also found that the court had personal jurisdiction over two individual defendants as to plaintiff's tortious interference with contract claim. *Id.* at 260. To support this determination, the Court of Appeals relied in large part on the fact that plaintiff had "conducted the majority of his negotiation, consultation, and advice services" out of his Philadelphia office in connection with the contract between him and his client. *Id.* The cir-

cumstances upon which the court based its determination in *Remick* stand in sharp contrast to the circumstances before the court here. The defendants in *Remick* clearly knew that plaintiff was a citizen of Pennsylvania and that by interfering with a contract between him and his client they would be causing him injury within the Commonwealth. As stated above, Harris bears the burden of establishing that TXU has contacts with Pennsylvania sufficient to support the court's exercise of personal jurisdiction. However, as noted above, Harris has failed to provide the court with any evidence to support his contention that TXU even knew he was a resident of Pennsylvania. Barring such proof, we cannot hold that TXU expressly aimed any tortious conduct at the forum.

In addition to his FCRA, defamation and tortious interference with contract claims, Harris has also brought a negligence claim. Since Harris has not established the minimum contacts required for this court to exercise personal jurisdiction over TXU as to his intentional tort claims, he clearly cannot satisfy that burden as to his negligence claim.

Harris urges the court to follow a decision of the District Court of Puerto Rico in which the court held that it had personal jurisdiction over an out-of-state creditor because it had "participated in tortious acts within Puerto Rico." *Rivera v. Bank One*, 145 F.R.D. 614, 619 (D.Puerto Rico 1993). In *Rivera*, plaintiff brought an action against a credit card company for allegedly reporting incorrect and derogatory credit information in his name. As with Harris, the plaintiff in *Rivera* alleged that the credit was procured by his ex-wife and that he had never incurred the debt. *Id.* at 622. However, in *Rivera* the court premised its finding of personal jurisdiction on the "intricate weave of written correspondence and telephone communica-

tions between the parties while [plaintiff] was in Puerto Rico." *Id.* Such correspondence consisted of several letters and telephone calls by Bank One to Rivera in Puerto Rico. *Id.* These contacts demonstrated that the incorrect credit reporting "was causing damage to plaintiff's credit within Puerto Rico," and clearly illustrated that Bank One knew that plaintiff was a resident of Puerto Rico. *Id.* Contrary to the "intricate weave" of correspondence between Rivera and Bank One, Harris simply maintains that he contacted TXU twice by telephone to dispute the debt. Such limited contacts fall short of satisfying the Third Circuit's test in *Imo Industries*, which requires Harris to show that TXU knew it was causing damage to him in Pennsylvania.

Significantly, the *Rivera* court also relied on the fact that throughout the credit dispute process, Bank One continued to try to collect the debt. The court stated:

> a Bank Card issuer's ability to report on the credit habits of its customers is [a] powerful tool designed, in part, to wrench compliance with payment terms from its cardholder. Bank One's alleged refusal to correct mistaken information can only be seen as an attempt to tighten the screws on a non-paying customer.

*Id.* at 623. In the instant case, it is undisputed that "TXU has never purposefully taken any actions in Pennsylvania as regards [the electric service] account." Again, TXU stated on the CDV forms that the $92 debt had been written off in March, 1995. Defendant TXU did not verify the CDV forms and send them to Trans Union with the hope of "wrench[ing] compliance" out of Harris. *Rivera*, 145 F.R.D. at 623. The facts in *Rivera* are clearly distinguishable from the present scenario.

**2.** Since we are dismissing this action for lack of personal jurisdiction as to defendant TXU,

By sending the two CDV forms to Trans Union and conversing with Harris once or twice on the telephone at his initiative, TXU could not "reasonably anticipate being haled into court" in Pennsylvania. *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559 (citations omitted). Moreover, "it cannot be said that [TXU] ... expressly aimed [its] conduct at Pennsylvania so that Pennsylvania was the focal point of the tortious activity." Accordingly, we will dismiss this action for lack of personal jurisdiction as to defendant TXU.[2] *Remick*, 238 F.3d at 259.

### ORDER

AND NOW, this 22nd day of March, 2002, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of defendant TXU Electric & Gas to dismiss the action as to it for lack of personal jurisdiction is GRANTED.

we will not address TXU's motion to dismiss for improper venue.