Sean GREENE, Plaintiff,

v.

NEW DANA PERFUMES CORPORA-
TION, DPC Acquisition Corporation,
Dana Do Brasil S.A., and Marcafin
S.A., Defendants.

Civ.A. No. 02–062.

United States District Court,
D. Delaware.

Oct. 23, 2002.

James E. Huggett, Carol A. Slocum, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, DE, of counsel: Roy R. Robertson, Jr., Michigan City, IN, for plaintiff Sean Greene.

Daniel V. Folt, Duane Morris LLP, Wilmington, DE, for defendants New Dana Perfumes Corporation, DPC Acquisition Corporation, and Marcafin, S.A.

### MEMORANDUM OPINION

THYNGE, United States Magistrate Judge.

## I. INTRODUCTION

This adversary proceeding was filed on December 16, 1999 in the United States Bankruptcy Court for the District of Delaware (D.I. 1)[1] by Sean Greene against defendants New Dana Perfumes Corporation ("New Dana"), DPC Acquisition Corporation ("DPC"), Dana Do Brasil S.A. ("Dana Brasil"), and Marcafin S.A. ("Marcafin"). The complaint alleges breach of an employment agreement (the "Employment Agreement") between Greene and defendants based on defendants' refusal to provide specified severance and other benefits due plaintiff if his employment was terminated without cause, as defined by the Employment Agreement.

New Dana and DPC filed a motion to dismiss the complaint on February 7, 2000 (D.I. 4) which was denied by the bankruptcy court on May 8, 2000 (D.I. 8). On May 23, 2000, DPC and New Dana filed a joint answer to the complaint (D.I. 16). On November 13, 2000, Marcafin filed a motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) (D.I. 26). A dispute arose between the parties as to the propriety of plaintiff conducting discovery on the jurisdictional question prior to plaintiff's response to Marcafin's motion to dismiss. Following briefing and a hearing on that issue, the bankruptcy court issued a memorandum opinion, dated December 14, 2000 (D.I. 36), permitting plaintiff sixty days to conduct

---

1. Greene's complaint and the associated motions and briefing thereon were filed as an adversary proceeding in the bankruptcy court, consequently, the docket numbers referenced are those assigned by the bankruptcy court.

discovery as to any contacts Marcafin had with the United States and requiring that plaintiff respond to Marcafin's motion to dismiss by March 1, 2001. Briefing on Marcafin's motion was completed on August 13, 2001. An order withdrawing the reference of this matter to the bankruptcy court was signed on September 18, 2001 (D.I. 93) and the matter was transferred to this court on January 25, 2002. This is the court's decision on Marcafin's motion to dismiss for lack of personal jurisdiction (D.I. 26).

## II. FACTS

Renaissance Cosmetics, Inc. ("RCI") was a holding company incorporated in Delaware in April 1994 by Dr. Thomas Bonoma ("Dr. Bonoma") and Kidd Kamm & Company for the purpose of acquiring cosmetic-related businesses which were to be operated as wholly-owned subsidiaries of RCI. Greene was recruited to join RCI in June 1994. Shortly thereafter, RCI began acquiring other companies. In August 1994, RCI acquired Cosmar Corporation ("Cosmar"). In December 1994, RCI acquired Les Parfums de Dana, Inc. ("Les Parfums de Dana") and its related companies, which included Marcafin. Les Parfums de Dana was redomesticated as Dana Corporation ("Dana"), a Delaware corporation. RCI continued to acquired other companies which became wholly-owned subsidiaries of either Cosmar or Dana.

The employment agreements of RCI's senior management each contained similar language concerning employment by RCI and certain of its subsidiaries. For example, Dr. Bonoma's August 1996 employment agreement, signed on RCI's behalf by John R. Jackson (RCI vice president and secretary), noted that Dr. Bonoma "has been the Chief Executive Officer of [RCI] and its subsidiaries since the formation of the Company" and stated that he would continue to "be employed as the Chief Executive Officer of the Company and each of its current and future subsidiaries." [2] Dr. Bonoma died in May 1997 and Norbert Becker was appointed the new chief executive officer and president of RCI at a special meeting of the RCI board that same month. The scope of employment described in Becker's employment agreement was similar to that set forth in Dr. Bonoma's employment agreement but contained less specific language with regard to RCI's subsidiaries. It stated that Becker was "employed as the President and Chief Executive Officer of [RCI] and President of such subsidiaries of [RCI] as may be designated by the Board of Directors of [RCI] at any time and from time to time." [3]

After Dr. Bonoma's death, RCI also negotiated the Employment Agreement with Greene dated November 1, 1997 and signed on behalf of RCI by Becker, as chief executive officer. Like Becker's contract, Greene's Employment Agreement provided that Greene would continue his employment with RCI and "certain of its subsidiaries (the 'Subsidiaries') as designated by the Chief Executive Officer and/or Board of Directors of RCI (the 'Board')." [4] Following financial losses in 1997 and 1998, RCI implemented a new business strategy which included, among other measures, reducing the company's overhead by "flattening its management structure and eliminating personnel at all

---

2. D.I. 57, Ex. B at 1. (Dr. Bonoma's employment agreement, Ex. 10.74 to RCI's Form 10–Q for 06/30/96, filed with the SEC on August 14, 1996).

3. D.I. 57, Ex. C at 28. (Becker's employment agreement, Ex. 10.1 to RCI's Form 10–Q for the Quarter Ended December 31, 1997).

4. D.I. 1, Ex. A (the Employment Agreement).

levels."[5] RCI sought to retain Greene, however, and on May 21, 1998, Greene and Becker executed Amendment No. 1 to the Employment Agreement (the "Amendment"). The Amendment, in part, replaced the language of the Employment Agreement stating Greene that was employed by RCI "and certain of its subsidiaries (the 'Subsidiaries') as designated by the Chief Executive Officer and/or Board of Directors of RCI (the 'Board')" with language specifying that Greene was employed by RCI,

> Dana Perfumes Corp., a Delaware corporation ("Dana"), Cosmar Corporation, a Delaware corporation ("Cosmar"), Flirt Cosmetics, Inc., a Nevada corporation, *Marcafin, S.A., a Swiss corporation ("Marcafin")*, Perfumes Dana do Brasil, S.A., a Brazilian corporation ("Dana Brasil"), and certain of RCI's other subsidiaries (the "Other Subsidiaries" and collectively with Dana, Cosmar, Flirt, Marcafin and Dana Brasil, the "Subsidiaries") as designated from time to time by the Chief Executive Officer and/or Board of Directors of RCI (the "Board"). RCI and the Subsidiaries are collectively referred to herein as the "Employers." This Agreement shall become effective as of November 1, 1997 (the "Effective Date").[6]

The Amendment also provided that "[a]ll references to 'Company' shall be deemed to refer to 'Employers.'"[7]

RCI, Dana, and Cosmar are debtors (the "Debtors") within the bankruptcy case.

Substantially all of the assets of the Debtors were sold to defendants New Dana and DPC as part of an asset purchase agreement (the "Asset Purchase Agreement") approved by the bankruptcy court on July 1, 1999. The assets purchased under that agreement included the stock and related assets and liabilities of Marcafin and Dana Brasil.

By letter dated August 3, 1999, a human resources representative of New Dana informed Greene that his employment was terminated effective July 30, 1999. No cause, as defined by the Employment Agreement, was given for the termination.[8]

## III. STANDARD OF REVIEW

Rule 12(b)(2) provides, in pertinent part

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:
>
> * * * * * *
>
> (2) lack of jurisdiction over the person ...[9]

Because there is no contention that Marcafin engaged in such continuous and systemic contacts with the United States so as to subject itself to general jurisdiction, the requirements for specific jurisdiction must be established before this court can exercise personal jurisdiction over Marcafin.[10]

---

**5.** D.I. 57, Ex. A at 10 (RCI's 3/31/98 10–K).

**6.** D.I. 1, Ex. B (the Amendment) (emphasis added).

**7.** *Id.*

**8.** *See id.,* Ex. D (termination letter) (stating that "[t]his letter is to notify you that due to the recent acquisition of Dana Perfumes Corporation by DPC Acquisition Corporation, ef-

fective 7/30/99, your last day of employment with Renaissance Cosmetics, Inc. was Friday, July 30, 1999"); *Id.,* Ex. A (the Employment Agreement) (defining "Cause" for termination at ¶ 5(d)(i)).

**9.** Fed.R.Civ.P. 12(b)(2).

**10.** *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 259 (3d Cir.2000) ("General personal jurisdiction ex-

A fundamental requirement is that the court determines that its exercise of personal jurisdiction over the defendant is consistent with due process requirements.

The Third Circuit has established a two-part test to determine whether the exercise of specific jurisdiction comports with due process. First, plaintiff must establish that the defendant has sufficient "minimum contacts" with the forum.[11] Second, the court, in its discretion, must determine that the exercise of jurisdiction "would comport with 'traditional notions of fair play and substantial justice.' "[12]

▆▆▆▆ In conducting its "minimum contacts" analysis where, as here, "federal jurisdiction is based on diversity of citizenship, the issue of personal jurisdiction over an out-of-state defendant is a question of state law with federal law only entering in to decide whether a state's assertion of

jurisdiction violates a constitutional guarantee."[13] The court's initial step, therefore, is to "determine whether the alleged conduct of a defendant comes within one of the provisions of the long arm statute."[14] The plaintiff bears the burden of establishing the required prerequisites to jurisdiction of the first part of the test.[15] Unlike a Fed.R.Civ.P. 12(b)(6) motion to dismiss, when considering a Rule 12(b)(2) motion to dismiss, the court does not limit its analysis to allegations contained in the pleadings but, rather, makes its determination of whether personal jurisdiction lies by reference to materials outside of the pleadings.[16] As a result, to meet its Rule 12(b)(2) burden, the plaintiff must present competent evidence demonstrating that a foreign defendant had sufficient contacts with the United States to support the court's exercise of jurisdiction.[17] The contacts shown must establish that the defen-

ists when the defendant's contacts with the forum, whether or not related to the litigation, are 'continuous and systematic.' ") (citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

**11.** *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir.1998) (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

**12.** *Id.* (citing *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Products Co.,* 75 F.3d 147, 150–51 (3d Cir.1996) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945))).

**13.** *Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1315 (D.Del.1987).

**14.** *Id.; see also IMO Indus., Inc.,* 155 F.3d at 258–259 (stating that the first step of a federal court's personal jurisdiction analysis in a diversity action is to "apply the relevant long-arm statute to see if it permits the exercise of personal jurisdiction").

**15.** *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1462 (D.Del.1991); *see also Carteret Sav. Bank v. Shushan,* 954 F.2d

141, 146 (3d Cir.1992) (stating that "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction") (citing *Time Share Vacation v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 65 (3d Cir.1984)).

**16.** *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984); *see also Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1462 (D.Del.1991) (stating that where discovery on the jurisdictional issue has been taken, " '[t]he Court need not be blind to discovered materials, and should look beyond the facade of the pleadings' ") (quoting *Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297, 1301 (D.Del.1990) (alteration in original)).

**17.** *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000); *see also Time Share Vacation Club,* 735 F.2d at 66 n. 9 ("[T]he plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.").

dant "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities."[18] Therefore, specific jurisdiction requires the existence of a nexus between the contact with the forum claimed by the plaintiff to establish jurisdiction and the plaintiff's cause of action.[19] If the plaintiff meets its burden, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable"[20] to avoid denial of its motion.

## IV. POSITIONS OF THE PARTIES

Greene asserts that as a result of the Amendment to his Employment Agreement, which states that his employers were RCI and the RCI-subsidiaries specifically listed (including Marcafin), he became an employee of each defendant and each defendant became liable to him for the obligations set forth in the Employment Agreement. After the Debtors filed for bankruptcy protection, the Asset Purchase Agreement was executed by which DPC purchased the assets of the Debtors' estate. One of the assets purchased was Marcafin. Pursuant to the Asset Purchase Agreement, DPC agreed to assume and pay all liabilities of the acquired assets. Greene maintains that shortly after the bankruptcy court approved the Asset Purchase Agreement, he was terminated without cause and has not received any of the severance or other benefits his employers are obligated to provide him as a result of such termination.

Greene offers two theories supporting this court's exercise personal jurisdiction over Marcafin. First, Green contends that there is evidence of sufficient contacts with the United States based on the activities of Marcafin agents in this country. Second, Greene contends that because Marcafin had no real separate existence apart from RCI during the relevant time-period and was, instead, treated as merely a business conduit of RCI, jurisdiction is proper under an "alter ego" theory of personal jurisdiction.

Greene argues that Marcafin had sufficient minimum contacts with the United States to have fair warning that it could be haled into a United States court to litigate the Employment Agreement. This fair warning is established, Greene contends, because Marcafin's former owner, Dana, and its parent RCI, caused Marcafin to enter into contracts in the United States through its agents in this country. These contracts allegedly included not only Greene's employment contract, but also, employment agreements with Becker and Jackson, and a consulting agreement with Ron Bowen. Greene alleges that the fact that he, Becker, Jackson, and certain consultants such as Bowen, were each employed by RCI and its subsidiaries is evidenced by the language of their respective contracts. It is asserted that each of these individuals conducted business in the Unit-

**18.** *BP Chemicals Ltd.*, 229 F.3d at 259 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

**19.** *Intel Corp. v. Broadcom Corp.*, 167 F.Supp.2d 692, 700 (D.Del.2001) (citing *Helicopteros Nacionales de Colombia S.A. v. Hall et al.*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

**20.** *Carteret Sav. Bank v. Shushan*, 954 F.2d 141, 150 (3d Cir.1992) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *see also Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217, 1226 (3d Cir.1992) (stating that "once the plaintiff has made a prima facie case for jurisdiction based upon minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional.*" (emphasis in original)).

ed States that directly benefitted Marcafin and the other RCI subsidiaries.[21] This assertion is purportedly shown through plaintiff's testimony recalling meetings, telephone calls and other business transactions benefitting RCI and its subsidiaries occurring in New York and across the United States, as well as, Marcafin documents executed in New York. Also, a purported forum selection clause in the Greene and Becker employment agreements requires that the contracts be construed under the laws of Delaware. Greene contends that a valid forum selection of that sort confers personal jurisdiction.

Because Greene has made a showing of sufficient contacts with the United States, it is alleged, the burden is on Marcafin to prove that this court's exercise of personal jurisdiction would be unconstitutional. Greene contends that Marcafin has offered insufficient evidence to support a determination that this court's exercise of jurisdiction would offend traditional notions of fair play and substantial justice. Therefore, Greene argues, Marcafin has failed to meet its burden and it motion should be denied.

Additionally, Greene argues that application of the "alter-ego" theory of personal jurisdiction supports his second argument for jurisdiction; that Marcafin was merely a business conduit of RCI. He asserts that, during the relevant time-period, RCI had a centralized management structure overseeing all of its subsidiaries and that Marcafin was treated by RCI as one of a number of departments of the parent company rather than a separate corporate entity. This assertion is established, accord-

ing to Greene, by the language of several RCI employment agreements that refer to the employees' responsibilities to RCI and its subsidiaries and which were signed by one individual on behalf of all of the RCI subsidiaries. Greene also points to his title as Group Vice President, rather than just Vice President, of RCI as support for his alter-ego argument.

Marcafin contends that its motion to dismiss should be granted because, far from meeting the minimum contacts required by due process, Marcafin has no contact with the United States whatsoever. Marcafin sets forth a number of facts supporting this contention. Marcafin notes that it is a corporation organized and existing under the laws of Switzerland with its principal executive offices located in Geneva, Switzerland, and that it is currently a wholly-owned subsidiary of Finanz St. Honore, B.V., a Dutch corporation located in the Netherlands. Marcafin is a self-described holding company with no employees that exists solely to own some foreign-registered trademarks.

Marcafin maintains that it has no active operations in the United States and transacts no business in this country. Marcafin avers that it does not own any real property in the United States, does not own or lease any offices in the United States, and does not maintain a post office box or telephone listing in the United States. Marcafin states that it does not currently, nor did it ever in the past, have an agent conducting business on its behalf in the United States. Finally, Marcafin insists it has directed no correspondence into the

**21.** Contrary to Greene's position that Ron Bowen's consulting agreement was "employed by RCI and its subsidiaries," D.I. 56 at 10, the May 12, 1998 letter from Becker to Bowen cited by plaintiff specifically states that the parties agree that Bowen is "an independent contractor and shall not be consid- ered an employee or agent of the Company or any of its affiliates pursuant to the terms hereof for any purposes whatsoever and [Bowen] shall have no right or authority to assume or create any obligation or liability, express or implied, on behalf of the Company or any of its affiliates." D.I. 57 at A-101 ¶ 5.

United States in connection with this, or any other, employment matter. In addition to arguing that it has no contacts with the United States, Marcafin insists that it is not bound by Greene's Employment Agreement.

Marcafin points out that it is not a signatory to the Employment Agreement and contends that no director, officer, or agent of Marcafin executed that, or any other, contract within the United States. Marcafin disputes Greene's allegation that Becker was employed by Marcafin and, therefore, had the ability to legally bind it via the Employment Agreement. Marcafin declares that it did not employ Becker and, additionally, that Becker never provided any employment services to Marcafin. Furthermore, Marcafin states that Becker had no agency power by which he was authorized or legally entitled to sign any employment agreements on behalf of Marcafin. Even if Marcafin had executed a contract with Greene, which it insists it did not, Marcafin contends that, without more, execution of a single contact is an insufficient basis from which to make a determination that it purposefully availed itself of the benefits and protections of United States law such that it could anticipate being haled into court in this country.

Although Marcafin urges that plaintiff's failure to meet his burden of establishing the first part of the Third Circuit's test for the exercise of specific jurisdiction makes analysis of the second part of that test unnecessary, defendant nevertheless maintains that jurisdiction is improper as the exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice. Marcafin contends it has been unduly burdened by this litigation due to "time-consuming and costly discovery on both merits and jurisdictional issues." [22] Marcafin also contends that if forced to defend this action in the United States, rather than in Switzerland, it would incur substantially increased expenses as a result of having to bring its witnesses from overseas and having to translate relevant documents into English. The costs associated with this litigation are significant because Marcafin claims that it is currently operating "in the red," has no operating profits, and is considering a winding up of the corporation.

Marcafin argues that Greene's second theory, that Marcafin is merely a business conduit of RCI, is disproved by the documents and testimony it has offered as evidence that Becker was never employed by Marcafin and had no ability or authority to bind it through his unilateral action. Marcafin states that Greene's characterization of a "centralized management structure" for RCI and its subsidiaries is just a description of many parent-subsidiary relationships and does not, by itself, establish that a subsidiary is nothing more than a business conduit of its parent.

## V. ANALYSIS

### A. Minimum Contacts

■ Initially, the court must determine whether Greene has met his burden of establishing sufficient minimum contacts with the United States on the part of Marcafin. Marcafin emphasizes the dual requirement that competent evidence be presented by plaintiff which establishes that there were sufficient contacts with the United States, and additionally, that those contacts relate to or arise out of this litigation. Marcafin characterizes plaintiff's argument as focused on a single allegation; that Becker signed Greene's employment agreement in the United States on behalf of Marcafin. Marcafin contends that be-

---

**22.** D.I. 60 at 24 (original NIBS docket entry # 59).

cause Becker was not a director, officer, employee, or agent of Marcafin, he did not have the power to bind Marcafin to the obligations of the Employment Agreement.

Since Marcafin's motion has "raise[d] the question of personal jurisdiction, [Greene] bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction."[23] This burden must be met by demonstrating that Marcafin's conduct comes under one of the provisions of Delaware's long-arm statute.[24] That statute, 10 *Del. C.* § 3104, applies to any person "who in person or through an agent: (1) transacts any business or performs any character of work or service in the [forum]." Plaintiff argues that the statute is satisfied in this case because Greene, as Marcafin's employee-agent, transacted business on behalf of Marcafin in the United States. To support this argument, plaintiff must present evidence demonstrating that Becker had the authority to bind Marcafin to the Employment Agreement. This case does not present a situation where Greene was forced to respond to Marcafin's motion to dismiss solely based on the pleadings or affidavits and without the opportunity to conduct discovery on the jurisdictional issue.[25] Plaintiff had several months within which to conduct discovery and from which to present competent evidence to the court on this jurisdictional issue.[26] As a result of that discovery, plaintiff has offered evidence in the form of RCI SEC filings, RCI employment agreements, his own deposition testimony and that of RCI employees

**23.** *Carteret Savings Bank, F.A. v. Shushan,* 954 F.2d 141, 146 (3d Cir.1992) (citing *Time Share Vacation v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 65 (3d Cir.1984)).

**24.** *Blue Ball Properties, Inc. v. McClain,* 658 F.Supp. 1310, 1315 (D.Del.1987).

**25.** Plaintiff has called the attention of this court to *Becker v. DPC Acquisition Corp.,* No. 00 CIV 1035 WK, 2001 WL 246385 (S.D.N.Y. March 13, 2001) (denying a motion to dismiss for lack of personal jurisdiction) as support for this court's denial of Marcafin's motion. Apart from the fact that the New York court made its determination on the basis of a different record and under the precedent of a different circuit, the procedural posture of that case is notably distinct from that before this court. The plaintiff in the New York case did not have any opportunity to conduct discovery and that court expressed the reservation that "the moving defendants may revive the jurisdictional question after discovery should newly-acquired evidence contradict plaintiff's preliminary showing." *Id.* at *6.

**26.** Plaintiff was originally given sixty days in which to conduct discovery before responding to defendant's motion to dismiss. Although plaintiff complained in his March 1, 2001 response to defendant's motion (D.I. 56) that the production of certain important papers by defendant in response to a request for production of documents late in the day on the day before plaintiff's response was due should have been provided earlier, plaintiff was not ultimately prejudiced by that purportedly last-minute production. In an order dated May 14, 2001 (D.I. 74), the bankruptcy court deferred consideration of defendant's motion to dismiss pending further, ongoing, discovery in the case which the parties stipulated was to continue through July 16, 2001. Following that additional discovery, plaintiff filed a supplemental memorandum in opposition to defendant's motion (D.I. 86) that included additional evidence obtained during that period. Consequently, plaintiff has had ample time in which to present competent evidence in opposition to defendant's motion to dismiss. Greene's testimony is that he recalls numerous meetings and phone calls that he conducted in this country on behalf of RCI and its subsidiaries and that, in his opinion, everything he did as group vice president of sales "reflected and was concerned with Marcafin and their ownership of trademarks," D.I. 86, Ex. D at 32 (Greene deposition). Such assertions might be sufficient to survive a motion to dismiss where a plaintiff is not afforded the opportunity to conduct discovery. After the period of discovery permitted in this case, however, more than those general averments will be required for Greene to meet his burden.

Jackson and David Tolly, interrogatory responses from Marcafin, and Marcafin corporate documents.

Defendant contends the evidence presented by Greene does not establish that Becker was an officer, director, employee, or agent of Marcafin having the authority to bind that company. Marcafin supports that contention with the affidavit and deposition testimony of former-Marcafin president Marc Albert and the affidavit of Dr. Michael Kneller (Swiss attorney and Marcafin board member and custodian of records) who each unequivocally assert that Becker never had such authority. Marcafin supplements the assertions of Albert and Kneller with the affidavit of unaffiliated Swiss attorney Markus Zwicky who tendered his opinion, based on the laws of Switzerland governing Marcafin and other Swiss corporations, that Becker had no authority to bind Marcafin when he the Employment Agreement, allegedly on Marcafin's behalf. Zwicky examined the Employment Agreement and the Amendment thereto, copies of Marcafin corporate minutes, a copy of Marcafin's by-laws, and a copy of the Commercial Register of Geneva, Switzerland ("Swiss Commercial Registry") pertaining to Marcafin. Zwicky analyzed the contents of those documents in the context of Swiss corporate law and reached the conclusion that Becker had neither actual nor apparent authority to bind Marcafin through the amended Employment Agreement.

Becker's authority to bind Marcafin is purportedly based upon the language of Becker's own August 27, 1997 employment agreement which named him president and chairman of the board of RCI following the death of RCI's co-founder, Dr. Bonoma. Contrary to Greene's assertion, however, the August 27, 1997 document did *not* appoint Becker "as the new Chief Executive Officer and President of RCI '*and each of its present and future subsidiaries.*' " [27] That contract states that he was to be employed "as the President and Chief Executive Officer of [RCI] and President of such subsidiaries of [RCI] *as may be designated* by the Board of Directors of [RCI] at any time and from time to time." [28] Therefore, based on the evidence before the court, until the RCI board designated Becker as president of a particular subsidiary, Becker did not have any such position with respect to the RCI subsidiaries. The earliest date at which such designation is suggested in the record is the May 21, 1998 amendment to Becker's August 27, 1997 employment agreement which, like the Amendment to Greene's Employment Agreement, purportedly changed Becker's employer from solely RCI to RCI and several specifically named subsidiaries, including Marcafin.[29] Greene

**27.** Greene's Brief in Response to Motion to Dismiss for Lack of Personal Jurisdiction, D.I. 56 at 2 (emphasis by Greene). It is troubling to the court that Greene's supplemental memorandum included a rewording of this misquotation, (*See* D.I. 86 at 6 "Dr. Thomas Bonoma, and his successor, Norbert Becker, were made executives of Renaissance and each of its existing and future subsidiaries."), particularly in light of the fact that Marcafin pointed out this glaring misquotation in is memorandum in support of the motion. *See* D.I. 60 at 18 (original NIBS docket entry # 59).

**28.** D.I. 57, Ex. C at 28 (Becker's employment agreement included as Exhibit 10.1 to RCI 10–Q for the quarter ended December 31, 1997) (emphasis added).

**29.** Plaintiff's complaint against Marcafin rests on a determination that Marcafin was actually one of Greene's employers bound by the terms of the Employment Agreement. It is worth noting that, although Greene makes much of the Amendment language purportedly including Marcafin as one of his employers, no explanation is given as to why it is insignificant to a determination of whether Marcafin was truly Greene's employer that the August

nevertheless asserts that on May 21, 1998, when Becker signed the Amendment to Greene's Employment Agreement, Becker was president of Marcafin and, therefore, Becker was authorized to bind Marcafin when he executed the Employment Amendment. Despite the language of the amendment to Becker's employment agreement, however, record evidence indicates that Becker was not actually Marcafin's president on that date, or during any other relevant time-period.

Marcafin contends that Albert DeChellis was president of Marcafin from November 1, 1996 to November 3, 1999, whereupon he was replaced as Marcafin's president by Albert. As support for this contention, Marcafin submits the sworn affidavit of Marcafin board member and custodian of records, Kneller, who represents himself as "an authorized speaker for and corporate designee of Marcafin with respect to the present and former officers, members, employees and authorized agents of the Company."[30] Kneller states that, upon review of all the business records of Marcafin, none of those records indicates that

Becker ever served in any capacity with Marcafin. To substantiate Kneller's statement, and to rebut the unreferenced contention of Greene that "DeChellis was terminated from his position with RCI and its subsidiaries, effective May 15, 1998,"[31] Marcafin points to a copy of the page of the Swiss Commercial Registry pertaining to Marcafin as "conclusive evidence of every person who served as a member (i.e., director)[32] or officer of Marcafin at all relevant times."[33] That document includes both DeChellis and Albert as having been president of Marcafin, but nowhere is Becker listed as having been either an officer or director of the company. Tellingly, Greene neither directly addresses the affidavit of Kneller nor challenges the authenticity and contents of the Swiss Commercial Registry.[34]

Swiss attorney Zwicky's affidavit addresses the reasons, according to Swiss law, that Becker was not authorized to execute any contract behalf of Marcafin. Zwicky lists several legal reasons that Becker could not have bound Marcafin by

---

3, 1999 New Dana letter terminating Greene without cause (allegedly triggering the employer's severance and benefit obligations) indicated the employment being terminated was only "with Renaissance Cosmetics, Inc." and did not specifically mention the termination of concurrent employment with Marcafin or any other RCI subsidiary. *See* D.I. 1, Ex. D.

**30.** D.I. 64 ¶ 2 (original NIBS docket entry # 63).

**31.** D.I. 56 at 3 n. 4.

**32.** Individuals "charged with the responsibility for running the business of Swiss corporations" are referred to as "members" rather than "directors." D.I. 63 ¶ 7 (original NIBS docket entry # 62). To avoid confusion, to the extent a reference is not a quotation, Marcafin "members" are referred to as either "directors" or "board members" in this opinion.

**33.** D.I. 60 at 7 (original NIBS docket entry # 59). Kneller describes the Swiss Commercial Registry as the place "where all information concerning the officers and members of Swiss corporations is recorded." D.I. 64 ¶ 8 (original NIBS docket entry # 63).

**34.** The only time Kneller is mentioned by plaintiff is in attacking Albert for relying too heavily on information supplied to him by Kneller when Albert was gathering information for his affidavit testimony. In an attempt to disparage any information Albert received from Kneller, plaintiff notes that Kneller was not designated a Marcafin board member until March 2000, long after the signing of the Amendment by Becker. Plaintiff does not, however, directly refute or rebut Kneller's affidavit testimony by challenging the corporate records of which Kneller is the custodian and upon which he based his testimony.

executing the Amendment to Greene's Employment Agreement:

> (a) he was not an employee, officer or member of Marcafin, (b) Swiss companies may only be bound by persons registered with the authorities to so bind those companies, or by persons bearing powers of attorneys executed by such duly registered persons, (c) Mr. Becker was not registered with the Swiss Commercial Data Registry, as required by law, to bind Marcafin to any agreements, and (d) [Zwicky found no] explicit or implicit general power of attorney for Mr. Becker, [and] (e) Mr. Becker had no apparent authority recognized under Swiss law to bind the Company.[35]

Zwicky also explained that Marcafin employed a well-known method of limiting the power of even those who are authorized to sign contracts on behalf of the company, a dual signature requirement. According the Zwicky, the Swiss Commercial Registry indicates that since December 11, 1990, Marcafin "has always and only granted signatory rights collectively by two and never single signatory rights."[36] Authorizations for any employees having signatory power must be filed and published via the Swiss Commercial Registry. Because Becker was never listed in that registry in any capacity with regard to Marcafin, Zwicky concludes that Becker had no authority to bind Marcafin. According to Zwicky, even if Becker had been authorized to sign a contract on behalf of Marcafin, Greene's Amendment would not have been binding on Marcafin for the additional reason that Marcafin always required two authorized signatures on its contracts and the Amendment was signed by only one allegedly authorized individual,

Becker. Zwicky states that the evidence establishes that Becker was never a director, officer or employee of Marcafin with express authority to bind Marcafin. Therefore, Zwicky testifies that Greene's amended Employment Agreement could not be legally binding on Marcafin, absent the limited circumstances recognized under Swiss law where one with apparent authority can bind a Swiss company. In Becker's case, however, Zwicky opines that apparent authority could not exist.

According to Zwicky, for Marcafin to be bound on a theory of apparent authority under Swiss law, Marcafin would have had to have expressed its intention to Becker that Marcafin intended to be bound by actions taken by Becker, such as the signing of employment agreements. Zwicky states that the intention to be bound by the acts of an agent is required because, "an agent . . . as a general rule of assumption, has no right of directly binding the company. Under Swiss law, it is incontrovertible that by 'never having done or known anything' the company will never be bound."[37] Because there is no Marcafin record that Becker was ever a director, officer, employee or agent of Marcafin, and none suggesting that Marcafin expressed to Becker its intention to be bound by his actions, Zwicky concludes that no actual or apparent authority existed by which Becker could have acted on Marcafin's behalf.

Before the Zwicky affidavit was filed, Green accused Marcafin of "seek[ing] to evade its responsibility under the Employment Agreement by attempting to hide behind undisclosed Swiss law."[38] Surprisingly, especially in light of that earlier statement, when confronted with disclosure of that Swiss law and Zwicky's appli-

---

35. D.I. 63 ¶ 3 (original NIBS docket entry # 62).

36. *Id.* ¶ 8.

37. *Id.* ¶ 12 (citation omitted).

38. D.I. 56 at 10.

cation of that law to record evidence in this case, no rebuttal or challenge to Zwicky's legal analysis is to be found in plaintiff's supplemental brief which was filed nearly five months later. Zwicky is never mentioned by plaintiff. Instead, Greene attacks the Albert affidavit as including statements not based on personal knowledge and attempts to meet his evidentiary burden by presenting documentary evidence and the deposition testimonies of RCI employees David Tolly,[39] Jackson, and himself. Of these, the most intriguing evidence relates to Jackson's employment agreement, signed by Becker, purportedly employing Jackson as vice president and secretary of Marcafin. Unfortunately for Greene, however, this evidence provides additional support for defendant's argument that Marcafin was an entity separate and distinct from RCI and not bound by Becker's independent actions.

Plaintiff argues that Jackson's May 15, 1998 employment agreement, which like Greene's contract was also signed by Becker, is evidence that Becker had the authority to bind Marcafin. Jackson's employment agreement contains almost identical language with regard to the purported scope of Jackson's employment as is contained in the Amendment to Greene's Employment Agreement. Jackson's contract states that he was employed by RCI and several specifically named subsidiaries, including Marcafin. Jackson's contract also recites that Jackson would "continue to be employed as Group Vice President ... for RCI and Vice President and Secretary of each of the Employers and the Subsidiaries."[40] Greene asserts that Marcafin's acknowledgment that Jackson served as its corporate secretary shows that Jackson's employment agreement validly conveyed that position to him and is evidence that Marcafin accepted Becker's authority to bind it with such contracts. At first blush this might appear to be a powerful argument. On closer inspection of the record, however, other evidence reveals that, rather than Becker being independently able to bind Marcafin, Marcafin was a separate corporate entity and acts by its actual officers and directors were required for Jackson's employment with Marcafin to be made effective.

Marcafin does not deny that Jackson served as its corporate secretary. Marcafin acknowledges this fact and points to the Swiss Commercial Registry as indicating that Jackson did indeed hold that position.[41] The Swiss Commercial Registry

---

**39.** David Tolly is a former employee of Development Specialists, Inc. ("DSI"). According to Greene, DSI was a consulting firm engaged to assist RCI in a restructure or bankruptcy and took over the management of RCI in August of 1998. *See* D.I. 86 at 8. David Tolly testifies that when DSI became involved with RCI he, too, was appointed as president of RCI and various RCI subsidiaries, including Marcafin, *Id.*, Ex. C at 66 (Tolly deposition), but acknowledged that he never saw any paperwork or other documentation suggesting that the Marcafin appointment had actually been effectuated. *Id.* at 76–77. As discussed with regard to Jackson's testimony, below, Tolly does not present any testimony helping to establish a nexus between possible Marcafin contacts with the United States and the execution of the Amendment to Greene's Em-

ployment Agreement as required for the exercise of specific jurisdiction.

**40.** D.I. 57, Ex. A at 104.

**41.** Apart from whether the signing of Jackson's employment agreement by Becker suggests an acknowledgment by Marcafin of Becker's authority to bind it to other employment agreements, like Greene's, whether or not Jackson was actually employed by Marcafin is not a fact, in and of itself, establishing a nexus between jurisdictional contacts with the United States and the contract being sued on by Greene. To the extent that Jackson's knowledge concerning Becker's authority to bind Marcafin would have strengthened Greene's position, that support is not evident

does not, however, indicate that Jackson was a vice president of Marcafin. Also, Marcafin board resolutions, submitted by both parties for different purposes, indicate that action by the Marcafin board was required to make Jackson Marcafin's secretary. The Marcafin resolution electing Jackson to the position of secretary of Marcafin was executed on June 15, 1997. This is a full month *after* Becker purportedly "employed" Jackson on behalf of Marcafin. That resolution was signed by DeChellis, Heinz Block, and Thomas Reimann, each of whom is listed on the Swiss Commercial Registry as having been a Marcafin director with signature authority. The Marcafin board resolution declaring that Jackson was no longer secretary of that company was signed on September 10, 1999 by Albert, Bloch, and Robert Schulp. Again, each of these individuals is listed as having been a Marcafin director on the Swiss Commercial Registry.[42] Again, each was listed as having had signature authority. Even though reality dictates that the wishes of the president and CEO of a parent corporation (which by definition has the voting power to control its subsidiaries) cannot be ignored, the fact of a parent-subsidiary relationship does not eliminate the separate existence of the subsidiary. The mere recitation in an RCI document, of which Marcafin was not a signatory, that an individual was employed

by Marcafin did not establish such employment absent action by Marcafin. Marcafin was, and continues to be, a separate entity and the evidence of the Marcafin board's actions relating to the election and removal of Jackson indicate that it was not bound by the unilateral actions of the RCI president and CEO. There is no evidence of similar action by the Marcafin board creating an employment relationship with Greene.

The evidence before the court, far from satisfying plaintiff's burden of establishing the propriety of personal jurisdiction over a foreign defendant, indicates that, although a subsidiary of RCI, Marcafin was an independent entity and that Becker was not authorized to bind Marcafin. This evidence shows that Greene's first theory for this court's exercise of personal jurisdiction fails. This same evidence also rebuts Greene's second, "alter-ego," theory for personal jurisdiction over Marcafin.

## B. The Alter–Ego Theory

 Greene asserts that, during the relevant period, Marcafin was merely a business conduit of RCI, a Delaware corporation, and, therefore, its separate existence was a legal fiction which can be ignored by the court and the exercise of personal jurisdiction over this defendant is proper. Delaware courts apply the alter

from Jackson's testimony. Although Jackson testified that specific thoughts regarding the validity of the Amendment to Greene's Employment Agreement "didn't cross [his] mind," D.I. 86, Ex B at 41 (Jackson deposition), when pressed, Jackson conceded that he did not know whether or not Becker was authorized to sign the Amendment on behalf of Marcafin. *Id.* at 81–82.

42. The resolutions related to Jackson's election and removal as Marcafin's secretary each indicate execution in New York, New York and Zurich, Switzerland. Greene suggests

that the fact that one or more of the three signatories of each resolution signed the document in New York is additional evidence of Marcafin's contact with the United States. Those documents, however, are not the subject of the underlying litigation. Actions connected to the execution of documents relating to Jackson's employment with Marcafin have no nexus with the execution of Greene's Employment Agreement-the subject of this litigation-as required for the exercise of specific jurisdiction.

ego strictly and analyze and employ a similar analysis to that of deciding whether it is appropriate to pierce the corporate veil.[43] Two "critical elements" are examined in making the court's determination:

> (1) whether the [foreign] defendant over whom jurisdiction is sought has no real corporate identity from a defendant over whom jurisdiction is clear ...; and (2) the existence of acts in [the forum] which can be fairly imputed to the [foreign] defendant and which satisfy the [state's] long-arm statute and/or federal due process requirements.[44]

When making these examinations, "Delaware courts have been very cautious about imputing even the acts of wholly-owned Delaware subsidiaries to parent corporations without an analysis of whether the corporate veil should be pierced or whether the parent corporation actively employed the subsidiary as its mere agent or instrumentality."[45] As the evidence pertaining to Jackson's employment agreement shows, Marcafin had a separate corporate existence at the time in question. No convincing evidence was offered to the contrary from which this court would deem it appropriate to pierce Marcafin's corporate veil. Greene's second theory for this court's exercise of personal jurisdiction over Marcafin therefore also fails.[46]

## VI. CONCLUSION

For the reasons stated above, Marcafin's motion to dismiss for lack of personal jurisdiction (D.I. 26) is GRANTED.

---

**43.** *HMG/Courtland Properties, Inc. v. Gray,* 729 A.2d 300, 307 (Del.Ch.1999).

**44.** *Id.* at 308.

**45.** *Id.* at 309.

**46.** In light of this court's determination that Becker did not bind Marcafin by executing Greene's Employment Amendment and the Amendment thereto, it is unnecessary to address plaintiff's contention that the Amendment contained a forum selection clause which confers personal jurisdiction. It is far from clear, however, that the referenced clause would have the effect suggested by plaintiff as it appears, as argued by the defendant, that the language in question is a choice-of-law clause (not a forum selection clause) which would not equate to a consent to jurisdiction. This court's determination also makes it unnecessary to comment on defendant's contention that the execution of a single contract in the United States is, by itself, insufficient to establish personal jurisdiction or its argument with regard to whether forcing Marcafin to litigate in this forum would comport with traditional notions of fair play and substantial justice.